In re M.B. et al., Minors (Cecil Partee et al., Petitioners-Appellees; Marylou B., Respondent-Appellant; Jose B., Respondent-Appellee).

First District (1st Division)   No. 1—90—2161

Opinion filed December 28, 1992.

Julius Lucius Echeles, Larry S. Kajfes, Ltd. (Larry S. Kajfes, of counsel), and Austin Christian Law Center (Gail Petrich, of counsel), all of Chicago, for appellant.

Ryan, Miller & Trafelet, P.C., of Chicago (Catherine M. Ryan, of counsel), for appellee Jose B.

Patrick T. Murphy, Public Guardian, of Chicago (Ellen Gorin and Kathleen G. Kennedy, of counsel), *amicus curiae* and for other appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

On March 7, 1990, the Department of Children and Family Services (DCFS) filed petitions for adjudication of wardship, alleging that the minors, S.B., M.B., and J.B., were neglected in that their environment was "injurious" to their welfare. The petition concerning S.B. also contained allegations of sexual abuse, and the petition concerning J.B. contained additional allegations of physical abuse. All the petitions sought temporary custody of the children. On that same date, the juvenile division of the circuit court (juvenile court) conducted a probable cause hearing. At the conclusion of the hearing, the court found that no probable cause existed to warrant the minors' placement in temporary custody, and the petitions were dismissed. The minors' mother, Marylou B., now appeals.[1]

We affirm.

At the time of the hearing, the minors' family situation was chaotic. Their parents, Jose and Marylou B., named as respondents in the petitions, were in the midst of divorce proceedings, which were pending in the domestic relations division of the circuit court (domestic relations court). The evidence showed that, on January 1, 1990, Marylou fled Illinois, taking both J.B. and M.B. with her. S.B. was abandoned in Marylou's Oak Park home. Although Marylou had a court date scheduled in the domestic relations court at that time, she failed to appear. Apparently in response to Marylou's flight, the domestic relations court entered an order on January 3, 1990, which gave Jose custody of the children. In mid-January, Marylou "abandoned" J.B. at a psychiatric unit in Atlanta, Georgia. At the time of the hearing, Jose had physical custody of S.B. and J.B., who had returned to Illinois from Georgia on March 1, 1990. Marylou and M.B.'s whereabouts, however, were unknown. As a result, a warrant had been issued for Marylou's arrest, and M.B. was the subject of a Federal Bureau of Investigation (FBI) search.

The juvenile court appointed a guardian *ad litem* for both S.B. and J.B. for the juvenile court proceedings. Attorneys representing

---

[1]Marylou is the only appellant in this action. The public guardian has filed a brief on behalf of the minors as *amicus curiae*. The Cook County State's Attorney, an appellee in this court, has adopted the brief submitted by the *amicus* as its brief. The other appellee, Jose B., the minors' father, has submitted his own brief to this court.

DCFS, Jose, and the State's Attorney's office were also present at the hearing. Although no timely appearance was filed on Marylou's behalf in this action,[2] the attorney who was representing her in the divorce action attended the hearing.

Diane Phillips, a DCFS child welfare supervisor, testified that she was familiar with the minors through her supervision of the case-worker assigned to the case, Anna Mitchell. M.B., who was in the physical custody of Marylou at the time of the hearing, had a hearing problem which necessitated her enrollment in special education. Such special education is begun when the child reaches the age of three, but M.B., who was four, had yet to be "intake[n]" in the special education school system.

On March 6, 1990, Phillips received a telephone call from Dr. Antonio Blanco, a psychiatrist at the Brauner Psychiatric Institute in Atlanta, Georgia. According to Blanco, he had been treating J.B. at the institute since mid-January 1990. During this treatment, J.B. told Blanco that he wanted to kill his father because he was afraid that his father was going to abuse him both physically and sexually. J.B. also told Blanco about instances of physical and sexual abuse "perpetrated" by his father against all three children. Blanco told Phillips that J.B. was "at serious risk" of both emotional and physical harm and that Blanco was "afraid" to allow J.B. to return to Illinois in accordance with the domestic relations court order.

Phillips also spoke with Jerome Anderson, a mental health assistant at the institute. Anderson, J.B.'s "counselor," told Phillips that J.B. had spoken of his father's membership in a cult, whose members "make him do things." J.B. also told him that he wanted to kill his father.

Phillips also recalled a "report of risk of sexual abuse" listing Jose as the offender in December 1987, but the matter never "came to court." Phillips admitted that she has spoken to the minors herself, but that J.B. never told her about any instances of sexual abuse. Phillips also identified a "fax letter," dated March 5, 1990, from Dr. Blanco, which made no mention of sexual abuse. However, noting J.B.'s allegations of physical abuse, Blanco wrote that "[w]e are concerned that the appropriate authorities in the Illinois area pursue this case in order to further protect the child's welfare." However, the letter failed to mention when the alleged abuse occurred. Phillips did not

---

[2]Marylou's attorney did not file an appearance in the juvenile court until March 14, 1990, one week after the court issued its order which dismissed the neglect petitions.

know J.B.'s whereabouts until March 2, 1990. Phillips also stated that the cult allegations were new allegations. Phillips was awaiting further "records" from Georgia, and she recommended to the court that Gary T. Morgan be appointed as the minors' temporary custodian based on the reports of physical and sexual abuse.

Diane Mead, a clinical social worker at the New Mexico Clinical Facility, testified that she used to work at Sarasan in Illinois, a non-residential treatment center for battered women. Mead was a therapist at the center since September 1987 and apparently counselled both Marylou and S.B., then 10 years old. Although Mead moved to New Mexico in July 1988, Marylou continued to telephone her as did S.B. The juvenile court sustained objections to Mead's testimony relating to the events of 1987, stating that it was concerned with "current information."

Mary Jo Gremp met Marylou through Gremp's support group for "mothers without custody." Marylou attended the group's monthly meetings in November and December 1987, and Gremp spoke with Marylou several times between meetings. Gremp has never met Jose and has never seen the minors with their father. Gremp admitted that she was a friend of Marylou and that she, like Marylou, is a mother without custody.

Gremp knows the minors, and she stated that she had talked to J.B. privately approximately eight times. During these conversations, J.B. told her that his father "wanted him dead." J.B. also told her that if he lied in court "on the domestic matter," his father would get him a "Nintendo." During another conversation, J.B. told her that "people that his dad knew" took him from school, brought him to a house, and "did things to him." These "friends of his dad's" made him do "vulgar things" such as drink urine. J.B. said that "there was a priest *** and his father and his girlfriend, Dawn, gave S.B. a wedding band and made her the bride of the devil." J.B. and S.B. also were forced to sing a song called "Live like a suicide." J.B. stated that he did not like his father and his father's friends and expressed fear of all of them. Gremp stated that these events took place in the fall of 1987 during weekends, but sometimes on weekdays as well. Gremp, however, did not call police nor did she notify DCFS or the attorneys involved in the divorce action pending in the domestic relations court, although she was aware of the existence of that action.

The juvenile court allowed S.B. to be questioned, *in camera*, by her guardian *ad litem*. S.B. was 12 years old and lived with her father. S.B. wished to continue to live with her father and was not afraid of him. S.B. stated that her father never harmed her, and she

had never seen her father harm J.B. S.B. did not recall telling Diane Mead that her father touched her when she was in bed at night. During the summer of 1989, S.B. spent a couple of months at Hephzibah Children's Association (Hephzibah), a child welfare agency in Oak Park which works together with DCFS. She was allowed supervised visitation with her father and later progressed to unsupervised visits with him. When her mother was not present, these visitations went well. S.B. admitted that she had told Mead that "she used to be afraid" of her father, but that she no longer was afraid of him because of the treatment she received at Hephzibah. S.B. no longer writes to Mead. S.B. stated that her father never hurt her, but that she had seen him hurt her mother. When her parents lived together, they "screamed and hollered" at each other and fought over the children. When her father left the house, S.B. remained with her mother, who had "a lot" of anger toward her father. Her mother took S.B. to many places for therapy, including River Edge Hospital and the Madden Center. S.B. stated that her mother would not pick her up when "it was time to go home."

The guardian *ad litem* also questioned J.B. *in camera*. At the time, J.B. was 14 years old and was living with his father, who had "picked him up" when he returned from Atlanta on March 1, 1990. J.B. stated that he was not allowed to speak with his father while he was at the Brauner Institute. J.B. was not afraid of his father. His father never hit him, nor did he make him do things he did not want to do. J.B. wanted to continue to reside with his father, where he lived with S.B., his half-brother, Jordan, and his father's fiancee, Dawn. Neither his father nor Dawn frightens him. His father never hit him or S.B. and never touched him in places he did not like.

J.B. did not like Dr. Blanco "that much." J.B. denied telling Blanco that his father had hit him or that he hated his father. J.B. liked Jerome Anderson "better than" Blanco, but J.B. also denied that he told Anderson that his father hit him. J.B. denied telling Anderson about a cult. J.B. did not know the meaning of the word "cult." J.B. knew Mary Jo Gremp, but could not remember talking privately with her. J.B. recalled telling Gremp that Beth and John Barclay, friends of his mother, took him from school to their home for an after school activity that J.B. had "signed up for." They never made J.B. do bad things. J.B. expressed anger toward his mother, who he claimed "abandoned me for some reason" at a hospital in Georgia.

J.B. stated that his father moved out of the family home on April 29, 1987. From that time until September 1989, J.B. did not see much

of his father. In the fall of 1989, his father started visitations which, at first, were supervised. In October, the visitations were changed to unsupervised. J.B.'s weekend visits with his father and Dawn were "okay." J.B. stated that his father had hit him "a long time ago," but he did not hit him "hard" and he "does not do that anymore."

Following the minors' testimony, the State and the guardian rested, and the juvenile court denied Jose's motion for a finding.

David Kirsch, the court-appointed attorney for the minors during the divorce action, testified that he has been their attorney since April 1988. Over the course of the years, Kirsch has spoken with the minors often. In May 1988, he asked S.B. if she wanted to visit her father. She said no because he used to hit her when he was drinking. Kirsch also asked her if her father had ever touched her in places she did not like, but she responded that he did not. After treatment at Hephzibah, visitation with her father commenced. S.B. has been living with her father exclusively since January 1990. Kirsch had spoken with her since January, and S.B. indicated that she was not afraid of living with her father and wanted to continue to do so. S.B. told him that her father no longer drinks, and Kirsch averred that he had seen no indication that Jose was drinking.

As for J.B., Kirsch asked him if he wanted to live with his mother when she was found. J.B. answered "not anymore." J.B. told Kirsch he wanted to live with his father and asked Kirsch if "we could get M.B. back." When Kirsch asked J.B. about physical abuse, J.B. stated that his father hit him once, prior to 1988, for "discipline." J.B. told him that his father had not hit him since that time. During the time that Kirsch had been involved with the family, he never saw any indication of cult involvement. The week before the hearing, Kirsch received a telephone call from a social worker in Georgia who informed him that J.B. was at the Brauner Institute, where Marylou had "checked him in" in January. Marylou, however, had not been heard from since that time. Kirsch was also told that someone in the "Atlanta mother's underground" had reported that Jose was involved in a religious cult and devil worship. Kirsch said this information came from a source "other than" J.B. Kirsch told the social worker that he had never heard of any allegations of sexual abuse prior to this. She then asked Kirsch if he thought J.B. would be in danger if he returned to his father, and Kirsch replied that he did not think that would be the case. Kirsch recommended that the court not take temporary custody away from Jose.

Following arguments, the juvenile court dismissed the petitions, finding that there was no probable cause and no urgent and immedi-

ate necessity for temporary placement. The court, in particular, noted J.B.'s testimony, which it characterized as "quite clear" and the fact that divorce and custody proceedings were ongoing in the domestic relations court.

On April 6, 1990, Marylou filed a motion for reconsideration, arguing that J.B.'s psychiatric records had become available. The court denied the motion on June 27, 1990.

Marylou argues that the juvenile court's finding of no probable cause was against the manifest weight of the evidence. The public guardian, as *amicus curiae* on behalf of the minors, also asserts a similar argument.

■ Jose responds that Marylou has no standing to appeal the juvenile court's order because she failed to appear at the hearing. We find this argument unpersuasive. The appearance filed by Marylou, although late, constituted her submission to the authority of the juvenile court and gave that court jurisdiction over her. (See *Miller v. Moseley* (1924), 311 Ill. 157, 142 N.E. 509; *Gilchrist Transportation Co. v. Northern Grain Co.* (1903), 107 Ill. App. 531, *aff'd* (1903), 204 Ill. 510, 68 N.E. 558. See also 3 Ill. L. & Prac. *Appearances* §5 (1953).) Moreover, section 1—5 of the Juvenile Court Act of 1987 states the "minor who is the subject of the proceeding and his parents, *** who are parties respondent have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also *** the right to be represented by counsel." (Ill. Rev. Stat. 1987, ch. 37, par. 801—5.) By virtue of this statute, Marylou was a party to the proceeding. At the hearing, counsel for Jose objected to Marylou's counsel's presence, but the circuit judge replied that "she will have a say." At that point, the judge asked all of the attorneys to report to chambers for a discussion which was held "off the record." When the case was resumed, counsel for Jose asked that Marylou's attorney, Gail Petrich, leave. The court indicated that it was "going to let all attorneys who are involved in the case remain." From this record and in view of the statutory provision and case law cited above, we believe that Marylou has standing to bring this appeal.

■ The proceedings under review here stem from petitions seeking temporary custody filed by the DCFS pursuant to section 2—3 of the Juvenile Court Act of 1987 (Juvenile Act) (Ill. Rev. Stat. 1987, ch. 37, par. 802—3). The Juvenile Act mandates that, in such circumstances, a temporary custody hearing be held where "all witnesses present shall be examined before the court in relation to any matter connected with the allegations made in the petition." (Ill. Rev. Stat.

1987, ch. 37, par. 802—10.) If the court "finds that there is not probable cause to believe that the minor is abused, neglected or dependent it shall release the minor and dismiss the petition." (Ill. Rev. Stat. 1987, ch. 37, par. 802—10(1).) In all child custody proceedings under the Juvenile Act, the juvenile court's primary concern is the best interests and welfare of the children involved. (*In re Stilley* (1977), 66 Ill. 2d 515, 363 N.E.2d 820.) To that end, the juvenile court is vested with wide discretion. (*In re W.B.* (1991), 213 Ill. App. 3d 274, 571 N.E.2d 1120; *In re J.K.F.* (1988), 174 Ill. App. 3d 732, 529 N.E.2d 92.) That court's opportunity to observe the demeanor and conduct of the parties and witnesses must be given great weight, and, upon review, its determinations will not be disturbed unless they are against the manifest weight of the evidence. *In re Stilley*, 66 Ill. 2d at 520; *In re J.K.F.*, 174 Ill. App. 3d at 734.

■ Under the Juvenile Act, a minor is neglected if his or her "environment is injurious" to his or her welfare. (Ill. Rev. Stat. 1987, ch. 37, par. 802—3(b).) Generally, "neglect" is the failure to exercise the care that circumstances justly demand, and it encompasses willful as well as unintentional disregard of parental duty. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 379 N.E.2d 872.) Cases involving an adjudication of neglect and wardship are *sui generis*, and each case ultimately must be decided on the basis of its own particular facts. *In re Stilley*, 66 Ill. 2d at 520; *In re Brooks*, 63 Ill. App. 3d at 337.

Since each child was the subject of a separate petition, and since the purpose of the Juvenile Act is to secure the care and guidance for "each minor" (Ill. Rev. Stat. 1987, ch. 37, par. 801—2), we will consider the findings as to M.B., S.B., and J.B. separately. We also note that, at the outset of the testimony, the State and DCFS stated that the petitions were based on "recent" outcries of abuse.

■ In reference to M.B., little evidence was adduced. Phillips testified that the child suffers from an unspecified hearing impairment and that, as a result, requires special education. As of the time of the hearing, however, M.B. was not enrolled in any such program. Phillips admitted that the child was with her mother, who had fled the State some three months before the hearing. Thus, any action taken by the juvenile court with regard to temporary placement would have been futile since M.B.'s whereabouts were unknown. Moreover, no evidence was presented which tended to prove that M.B.'s legal custodian, Jose, had subjected M.B. to an "injurious" environment. Rather, the evidence established that M.B. never resided with Jose, since the domestic court order which gave Jose custody was entered after M.B. was taken from Illinois by Marylou. The juvenile court's dismissal of

the petition as to M.B., therefore, was not against the manifest weight of the evidence.

■■ As to the charges concerning S.B., the petition filed upon her behalf alleged that her environment was injurious to her in that she was sexually abused by her father. However, S.B. testified that her father never touched her in places that she did not like. Kirsch, the minors' guardian *ad litem* for over two years, also testified that he had specifically asked S.B. whether her father had touched her sexually and she replied that he had not. Phillips recalled an earlier "report" of a "risk" of sexual abuse in which Jose was the alleged offender; however, she also admitted that that charge never was adjudicated. Thus, the only evidence of recent sexual abuse as to S.B. was Phillips' testimony that Dr. Blanco told her that J.B. told him that his father had committed acts of sexual abuse against all three minors. However, if J.B.'s statement to Blanco was the basis of the sexual abuse charges contained in the petition concerning S.B., we find it curious that the DCFS failed to include similar charges in the petitions concerning J.B. and M.B. since J.B. allegedly accused his father of sexually abusing him and M.B. as well as S.B. In any event, J.B.'s alleged allegations concerning the cult also could be viewed as sexual in nature in that S.B. was the "bride of the devil." However, J.B. denied making these statements and testified that he never saw his father harm S.B.

Marylou argues that J.B.'s previous statements to Dr. Blanco and to Anderson constituted sufficient evidence to establish probable cause. We disagree.

Section 2—18(4)(c) of the Juvenile Court Act provides that

"[p]revious statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." (Ill. Rev. Stat. 1987, ch. 37, par. 802—18(4)(c).)

Accordingly, J.B.'s previous statements to Blanco and Anderson, who were not subject to cross-examination and which were not corroborated, cannot establish abuse or neglect. (*In re Marcus E.* (1989), 183 Ill. App. 3d 693, 539 N.E.2d 344.) Corroborating evidence has been held to be "evidence which by its nature makes it more probable that the child was actually abused, and the corroboration of a child's claim of abuse requires more than the fact that two or more witnesses may testify that the child related the claims to them." *In re Marcus E.*, 183 Ill. App. 3d at 705.

Here, Phillips repeated what was told to her by Blanco and Anderson, both of whom were unavailable for cross-examination. Marylou directs attention to Mary Jo Gremp's testimony, which she argues provides the requisite corroboration to Anderson's statements. However, as we noted above, corroboration consists of more than testimony that the child related similar claims of abuse to the witness. After carefully reviewing Gremp's entire testimony, we are of the opinion that it was not corroborative of Anderson's statements for a number of reasons. Gremp was the only other witness to testify as to the cult activity. It was her testimony, in fact, which provided the graphic details of the alleged activity, since Phillips stated that Anderson did not question J.B. in detail regarding the nature of the cult's activities. Gremp also stated that J.B. related the cult story to her in late 1987. However, Gremp failed to contact police, DCFS, or even Marylou's divorce attorney at that time. That Gremp, admittedly a friend of Marylou and sympathetic to her plight as a mother fighting for custody, would stand idle for over three years in the face of such monstrous allegations certainly does not constitute "evidence which by its nature makes it more probable that the child was actually abused." (*In re Marcus E.*, 183 Ill. App. 3d at 705.) Furthermore, the time frame to which Gremp testified is at odds with both S.B.'s and J.B.'s testimony regarding their family situation at that time. J.B. testified that he saw little of his father after Jose moved out of the family home in 1987 and that he only began visitation with him in the fall of 1989. S.B. stated that when her father moved out of the family home, the children remained with their mother. S.B. began visitations with her father during the fall of 1989 with the intervention of Hephzibah. From the nature of the testimony, it appears that Jose had little, if any, contact with the children in the years prior to the fall of 1989.

The same analysis can be used to evaluate the petition concerning J.B., which based the charge of neglect on physical abuse. Again, much is made of J.B.'s statement to Dr. Blanco that his father had hit him. However, J.B. stated that his father hit him once prior to 1988, apparently for disciplinary reasons, and had not hit him again. Although the State and DCFS based the petitions on "recent" outcries of abuse, most notably the charges of cult involvement, their witnesses, with the exception of Phillips, all testified as to charges which were over three years old. Phillips, herself, stated that she did not know the nature of the cult charges as told to her by Anderson because he did not "push" J.B. in his questioning. Additionally, we note that no psychiatric testimony was presented to the juvenile court. Al-

though there is mention in the record of Hephzibah's involvement with the family, there was no evidence presented, either documentary or testimonial, concerning the children's progress or lack thereof in relating to either parent or either parent's progress in parenting the children, evidence which, we note, is commonly adduced in such cases. Phillips did state, however, that Hephzibah and DCFS apparently had agreed that Jose take custody of the children. In view of the nature of the evidence presented at the March 7 hearing, we cannot conclude that the juvenile court's determinations as to the petitions concerning J.B. and S.B. were against the manifest weight of the evidence.

Marylou next argues that the juvenile court erred by failing to inquire as to the children's perceptions concerning the truth.

■ The Juvenile Act states that "[t]here shall be a rebuttable presumption that a minor is competent to testify in abuse or neglect proceedings." (Ill. Rev. Stat. 1987, ch. 37, par. 802—18(4)(d).) The Act leaves to the juvenile court the determination of how much weight shall be given to the minor's testimony. (Ill. Rev. Stat. 1987, ch. 37, par. 802—18(4)(d).) Moreover, this court has held that witnesses aged 14 and over are also presumed competent to testify. (*In re E.S.* (1986), 145 Ill. App. 3d 906, 495 N.E.2d 1334.) Age alone, however, is not determinative of competency to testify. The minor must be sufficiently mature to receive correct impressions from senses, be able to recollect these impressions, to comprehend questions, and to narrate answers intelligently. The minor must also be capable to appreciate the moral duty to tell the truth. *People v. Ballinger* (1967), 36 Ill. 2d 620, 225 N.E.2d 10 *cert. denied* (1967), 388 U.S. 920, 18 L. Ed. 2d 1366, 87 S. Ct. 2141.

■ A review of J.B.'s testimony reveals that he was competent to testify. At the time of the hearing, J.B. was 14 years old. By virtue of his age, therefore, this court can presume competency. Moreover, nothing in the record indicates that the presumption was rebutted. J.B. gave clear, forthright answers to the questions put to him. He impressed both the trial judge and his inquisitors by his recollection of the exact date on which his parents split up. As to S.B., who was 12 years old at the time, her testimony also indicates that the Juvenile Act's presumption was not rebutted. She was able to give her address, stated that she goes to school, and is picked up from school by either her father or her Hephzibah "worker." S.B. had recollections of her family life when both her parents lived together, and she recalled her parents "screaming and hollering at each other," which indicates that she was able to receive impressions. Based upon our review of

the minors' testimony, we rule that both children possessed the competency to testify.

■ Marylou and the public guardian argue that the juvenile court erroneously denied Marylou's motion for reconsideration of the dismissal of the petitions because the motion was based on previously unavailable information. The information apparently consisted of the records that Phillips testified that she was waiting to receive from Georgia officials.

Pursuant to Supreme Court Rule 660(b) (134 Ill. 2d R. 660(b)), all juvenile proceedings not involving delinquency proceedings are governed by the rules applicable to civil cases. (*In re B.H.* (1991), 218 Ill. App. 3d 583, 579 N.E.2d 19.) Section 2—1203 of the Code of Civil Procedure provides that, in cases tried without a jury, any party may, within 30 days of the entry of judgment, file a motion for a rehearing or for any "other relief." (Ill. Rev. Stat. 1987, ch. 110, par. 2—1203.) Such motions are addressed to the circuit court's discretion, and its decision regarding such a motion will not be reversed absent an abuse of that discretion. *Harris v. Harris* (1977), 45 Ill. App. 3d 820, 360 N.E.2d 113.

Although Marylou's counsel argued the motion to the juvenile court, she made no mention of the newly received information from the Georgia officials, the main focus of the motion for reconsideration. Instead, counsel inexplicably reargued the evidence which had been adduced at the original hearing. Based on the motion filed and the arguments made to the juvenile court, it cannot be said that the court abused its discretion in denying the motion for reconsideration.

The judgment of the juvenile court, therefore, is affirmed.

Affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.