*In re* W.B., JR., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. William Baker, Sr., Respondent-Appellant).

Fourth District    Nos. 4—90—0705, 4—91—0076 cons.

Opinion filed May 8, 1991.

Lynne R. Feldman, of Kirtley-Pavia-Marsh, P.C., of Urbana, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Elliott Turpin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Diana Lenik, of Urbana, guardian *ad litem.*

JUSTICE SPITZ delivered the opinion of the court:

Respondent appeals a trial court order removing custody of W.B., Jr., from him and awarding custody to the child's mother. We affirm.

On June 27, 1990, the State filed a two-count petition in the Champaign County circuit court which alleged in count I that J.B., C.B., and W.B., Jr., were neglected-abused minors under the age of 18 whose environment is injurious to their welfare when they reside with their parents, William Baker, Sr., and/or Theresa Taylor. At the time of the petition, W.B., Jr., was six years old, J.B. was one year old, and C.B. was three months old. Count II alleged that the parents create a substantial risk of physical injury to the children by other than accidental means, and that these acts by the parents would be likely to cause impairment of the emotional health or bodily functions of the minors. The petition sought a shelter-care hearing.

A shelter-care hearing was held on June 27, 1990. Present at the hearing were Baker and Taylor, who informed the trial court that they had an attorney, but that the attorney could not be present at the hearing. The court noted that Baker and Taylor were at a disadvantage not having an attorney, but informed them that the law provided the hearing had to be held within 48 hours of the time the Department of Children and Family Services (DCFS) took protective custody of the children. The court was unavailable the next day and proceeded with the hearing.

Evidence presented at the hearing revealed that Baker is the father of the three children, and Taylor, with whom he was living, is the mother of J.B. and C.B. Nancy Fitzgerald, who was living in Nevada, is the biological mother of W.B., Jr. All three children lived with Baker and Taylor. Sandra Potzer, a child-protection investigator with DCFS, testified that on June 13, 1990, she received a report alleging that J.B., C.B., and W.B., Jr., were at a substantial risk of injury. That report alleged that there had been a serious domestic dispute between Baker and Taylor, and that Taylor had pursued a protective order, but later dropped it and returned with the children to live with Baker. Potzer unsuccessfully attempted to see the children at their home upon receiving this report.

On June 25, 1990, a relative of the children contacted Potzer and stated that Taylor had asked the relative to temporarily care for J.B. and C.B. because Taylor needed a few days to search for a new residence for her and the children to live without Baker. Potzer called Taylor that same day and asked to speak to her about the children. Taylor informed Potzer that she and Baker were looking for a new residence for both of them and that Potzer should call later. Potzer then went to Baker's residence with an investigator from the Champaign County sheriff's department, and there found Baker, Taylor, and W.B., Jr. Potzer spoke to these three about a police report Taylor filed on May 22, 1990.

Taylor told Potzer that several days before May 22, Baker verbally and physically abused her, threatened her with a knife and gun, and cut her with the knife. Taylor also told Potzer that Baker tied her legs up, gagged her, and raped her. The three children were at home while these events occurred. Baker told Potzer that he was peeling potatoes and that Taylor turned around abruptly and bumped into the knife, cutting her hands. Taylor responded that Baker threatened her with the knife and that she was cut trying to take the knife away. Baker confirmed tying Taylor up and placing her on the bed so she would not get away. Baker indicated that he had been drinking that night. Taylor obtained an order of protection after this incident but later dropped it because she and Baker planned to get married. The two also indicated that they were being evicted and that there were lice and opossum in the trailer.

Potzer also interviewed W.B., Jr., alone. W.B., Jr., indicated that when Baker and Taylor fight, Taylor gets hurt. W.B., Jr., saw his dad cut Taylor with a knife and punch her. Taylor later had a black eye. This fighting made W.B., Jr., sad and scared. W.B., Jr., went into the kitchen with Potzer and described being in the room when his father pulled a knife off the counter. According to W.B., Jr., Baker pushed Taylor down, picked up a knife, and cut Taylor. W.B., Jr., denied that Baker was using the knife to cut potatoes or anything else. W.B., Jr., also described Baker putting a gun on Taylor's stomach and pulling the trigger. However, there were no bullets in the gun. W.B., Jr., further described how Baker poured soda on Taylor.

Potzer next testified that there was a previous report for medical neglect. An investigation dated October 12, 1988, revealed that W.B., Jr., had a high level of carbon monoxide poisoning from a broken furnace. Baker and Taylor removed W.B., Jr., from the hospital against medical advice when he was being treated for the poisoning. Another report was filed on November 29, 1988, this time for substantial risk

of physical injury. This report involved a domestic dispute between Baker and Taylor in an operating motor vehicle. Taylor reported to DCFS that Baker had physically abused her and that he had kicked W.B., Jr., grabbed him by the throat, and shaken him.

Potzer also testified that she spoke to W.B., Jr.'s biological mother, Fitzgerald, on June 26, 1990. Fitzgerald told Potzer that the last time she had seen W.B., Jr., was when he was five months old, but that she had had some telephone contact with him. Fitzgerald also told Potzer that she had not had contact with W.B., Jr., because Baker took him away from her when W.B., Jr., was five months old. Baker had told Fitzgerald numerous times that if she ever attempted to obtain custody of W.B., Jr., he would kill the child and then kill her. Fitzgerald also told Potzer that she had lived with Baker for approximately one year and, during that time, he had physically abused her, beat her, tied her hands and feet together, gagged her, and choked her.

After the State finished examining Potzer, the court asked Taylor and Baker each if they had any questions for Potzer. Taylor declined, but Baker asked Potzer several questions. After asking Potzer several questions, however, Baker stated that he was having no luck and needed an attorney. Baker then informed the court that his attorney told him to ask for an extension so that the attorney could be present. The attorney did not indicate to Baker when he could be at the hearings. The court noted that it was too late to ask for a continuance since the evidence had already been presented.

The court acknowledged that the evidence was uncontested and very preliminary, but found that due to the emotional harm and physical danger portrayed, it was a matter of immediate and urgent necessity that a temporary custodian be appointed. An order for temporary custody was entered on June 27, 1990.

On July 26, 1990, Taylor stipulated to the allegation of the petition contained in count I, that J.B. and C.B. were her children, and that they were neglected. At that same hearing, Fitzgerald stipulated to the allegation in count I, that W.B., Jr., was her son and that he was neglected. Baker was also supposed to stipulate, but changed his mind the morning of the hearing. The court set an adjudicatory hearing for Baker for November 19, 1990. Adjudicatory orders were entered August 4, 1990, concerning Taylor's and Fitzgerald's stipulations.

On September 6, 1990, Fitzgerald's dispositional hearing was held. At this hearing, the court noted that there had been no adjudication as to Baker yet, and as such, the court did not have the benefit

of factual determinations with regard to the allegations pertaining to him. However, the court also noted that it had the benefit of two home and background reports, which included substantial information about Baker and his relationship to the mothers of the three children. The court further noted that Baker had the opportunity at the current hearing, as well as the two other hearings, to adduce any evidence he may have had to contravene the allegations made in the dispositional reports. The only evidence Baker put forth was his disagreement with the dispositional reports.

The court next noted that both respondent mothers had stipulated to the facts contained in the allegations, which the court took as persuasive evidence that problems of domestic violence and environmental neglect occur. The court then found Baker unable and unfit for reasons other than financial circumstances alone to care for, protect, and train W.B., Jr. (The court later reversed this finding of unfitness at the hearing, noting that it would be unfair to make the decision without an adjudicatory hearing.) The court went on to note that the only evidence to suggest that Fitzgerald was unable to exercise custody of W.B., Jr., was her lengthy absence from him. However, the court also noted that Fitzgerald's recent reunion with W.B., Jr., was very warm and appropriate, and that Fitzgerald also has had custody of another son, D.B., since 1984, which suggested that she was not an "inappropriate parent." The court concluded that it could find no legal basis for withholding custody or depriving Fitzgerald of custody of W.B., Jr. The court found W.B., Jr., to be neglected and made him a ward of the court. Custody of W.B., Jr., was removed from the father, Baker, not due to any finding of unfitness or inability, but because of the best interests of W.B., Jr., that he be placed with Fitzgerald. Fitzgerald was appointed custodian of W.B., Jr., and guardianship was given to DCFS.

On November 19, 1990, Baker's adjudicatory hearing was held. The court noted a report from the Nevada Department of Human Resources and Welfare which recommended against placement of W.B., Jr., with Fitzgerald. Concerns of the report included the fact that Fitzgerald has or had a relationship with Baker's brother, Donald, and that Donald was in prison at the current time; Fitzgerald did not have insurance for W.B., Jr.; and Fitzgerald did not have an appropriate residence. The court noted that the custody decision was difficult, and was one which could legitimately be criticized by both sides. However, the court found several compelling factors present in Fitzgerald's life, despite the negative factors, which indicated she should be granted custody. First, Fitzgerald had custody of another son, D.B., and the

State of Nevada apparently had no concern with that. This led the court to wonder why Fitzgerald could not supply a proper home for W.B., Jr., when she could apparently do so for D.B. The court further noted that steps taken the previous summer by DCFS and Fitzgerald had helped the situation, and that W.B., Jr., had done well since living with his mother. Although Fitzgerald's relationship with W.B., Jr., was not ideal, the court found it to be the best alternative available. Thus, the court continued custody of W.B., Jr., with Fitzgerald. The court noted, however, that this placement was subject to change upon the disposition as to respondent Baker.

Later at the hearing, Baker stipulated to the allegations contained in count I of the petition. The court set a dispositional hearing for December 20, 1990.

At Baker's dispositional hearing on December 20, DCFS recommended continuing the current arrangement of custody. Baker's attorney, noting that Baker was incarcerated at the present time, although he was present in court, stated that Baker agreed with the DCFS recommendation, or at least did not object to it. Baker's attorney also noted that Baker had agreed, although not entirely, with the reports concerning the abuse and danger of the environment to the children. The court then found Baker unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline the respondent minors and removed custody of the minors from Baker. Baker subsequently filed this appeal, which concerns only the removal of custody of W.B., Jr.

On appeal, Baker makes three arguments, all of which are without merit. First, Baker argues that the trial court failed to comply with sections 601 through 610 of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1989, ch. 40, pars. 601 through 610). Specifically, Baker argues that the court erred in awarding custody of W.B., Jr., to Fitzgerald without any petition on file by Fitzgerald for custody of W.B., Jr., and without an adjudication as to him, the custodial father. Baker argues that section 601 of the Act provides that a court has jurisdiction to determine child custody matters if the following occurs: (1) a parent files a petition for custody; or (2) a person other than a parent files a petition for custody, but only if that child is not in the physical custody of his parents. (Ill. Rev. Stat. 1989, ch. 40, par. 601.) Baker argues that nothing in the record indicates that Fitzgerald ever filed a petition with the court.

Baker fails to realize, however, that procedures under the Act are not the exclusive means by which the trial court acquires jurisdiction in child custody cases. Child custody proceedings may also be ini-

tiated under the Juvenile Court Act of 1987 (Juvenile Act) (Ill. Rev. Stat. 1989, ch. 37, par. 801—1 *et seq.*). Section 2—13 of the Juvenile Act provides that a petition for wardship may be filed by the State's Attorney, alleging that the minor is abused, neglected, or dependent, and that it is in the best interests of the minor and of the public that he be adjudged a ward of the court. (Ill. Rev. Stat. 1989, ch. 37, par. 802—13.) Here, the State's Attorney's office filed a petition for wardship on June 27, 1990, alleging that W.B., Jr., J.B., and C.B. were neglected and abused. Thus, the circuit court of Champaign County acquired jurisdiction in this case. *In re Lehmann* (1989), 186 Ill. App. 3d 592, 595, 542 N.E.2d 754, 756.

Baker also argues here that section 610 of the Act requires a motion to modify custody as well as findings by the court, by clear and convincing evidence, that a change has occurred in the circumstances of the child or his custodian, and that modification is necessary to serve the best interests of the child. Baker claims that neither Fitzgerald nor the State made such motion and that the evidence was not sufficient to support a change of custody. Concerning the evidence, Baker argues that the court made its decision before it had the Nevada report, which recommended against awarding·custody to Fitzgerald, and before he had his dispositional hearing.

■ Again, Baker cites the wrong act, as proceedings were held pursuant to the Juvenile Act, rather than the Act. Under the Juvenile Act, the court followed the proper procedure to find W.B., Jr., neglected, make him a ward of the court, remove custody from Baker, and award custody to Fitzgerald. We further note that Baker stipulated to the allegations in count I of the petition, thus admitting his neglect, and agreed, or at least did not object, to the court's order at his dispositional hearing.

Baker's second issue on appeal is that the trial court manifestly abused its discretion in determining it was in W.B., Jr.'s best interest that custody be awarded to Fitzgerald. Baker argues, without citation to statute or authority, that the following facts reveal the court's error: (1) Fitzgerald left W.B., Jr., with Baker when W.B., Jr., was five months old; (2) Fitzgerald had a pattern of living with abusive and bad men; (3) Fitzgerald currently resides with Baker's brother, Donald, who was convicted in 1978 for armed robbery and was incarcerated for another serious offense at the time of the hearings; (4) Fitzgerald has no medical coverage or independent residence; (5) the State of Nevada recommended against placement of W.B., Jr., with Fitzgerald; and (6) DCFS recommended retaining guardianship of the minor with DCFS. Baker further argues that he had cared for W.B.,

Jr., without any help from Fitzgerald, for six years, and at the time of the September 14, 1990, order, there was no adjudication that W.B., Jr., was neglected by being in an environment injurious to his welfare when residing with his father.

We initially note that in making this argument, Baker neglects to note obvious factors in opposition to those he cites. First, while Baker claims that Fitzgerald left W.B., Jr., with him when W.B., Jr., was five months old, Baker fails to mention that Fitzgerald claimed that Baker took W.B., Jr., away from her and threatened to kill both W.B., Jr., and her if she tried to get W.B., Jr., back. Considering the evidence detailing Baker's history of violence, this threat does not seem unrealistic. And, while Fitzgerald had a pattern of living with abusive men, Baker fails to note that he was one of these abusive men. Moreover, while Fitzgerald was living with Baker's brother, Donald, who was incarcerated at the time of the hearings, the court noted that Donald had not been abusive toward Fitzgerald when the two lived together.

■ In child custody proceedings under the Juvenile Act, the best interest of the child is the standard and the trial court is vested with wide discretion. (*In re J.K.F.* (1988), 174 Ill. App. 3d 732, 733-34, 529 N.E.2d 92, 93.) The trial court's opportunity to observe the demeanor and conduct of the parties and witnesses must be given great weight. Thus, the determination of the trial court will not be disturbed unless it is against the manifest weight of the evidence. (*J.K.F.*, 174 Ill. App. 3d at 734, 529 N.E.2d at 93-94.) The court in the instant case had an admittedly difficult decision to make concerning W.B., Jr. However, after reviewing all the evidence, and noting that W.B., Jr., and Fitzgerald were getting along well, the court determined it would be in the best interests of W.B., Jr., to place custody of the child with his mother rather than with foster parents. The trial court did not consider Baker to be a placement alternative. The trial court did not abuse its discretion. Moreover, we note that at his dispositional hearing, Baker agreed, or at least did not object, to the court's order.

■ Finally, Baker argues on appeal that it was a violation of due process to require him to act as his own counsel at the June 27, 1990, shelter-care hearing. Again, this argument is without merit. Baker argues that State intervention sufficiently undercutting a parent's fundamental liberty interest and free personal choice in matters involving family life or which has divisive impact on family relations requires strict adherence to requirements of procedural due process. (*In re J.M.* (1988), 170 Ill. App. 3d 552, 565, 524 N.E.2d 1241, 1250.) Due process requires that a minor and his parents receive many of the

same constitutional protections in a juvenile proceeding as a party receives in a civil or criminal proceeding. *In re R.P.* (1981), 97 Ill. App. 3d 889, 891, 423 N.E.2d 920, 922.

However, the Illinois Supreme Court has held that in proceedings on a petition to terminate parental status and appoint a guardian to consent to adoption, the parents have no constitutional right to counsel. (*People v. Lackey* (1980), 79 Ill. 2d 466, 468, 405 N.E.2d 748, 749; *In re Adoption of Hoffman* (1975), 61 Ill. 2d 569, 338 N.E.2d 862, *cert. denied* (1976), 425 U.S. 958, 48 L. Ed. 2d 202, 96 S. Ct. 1738.) If due process does not mandate the right to counsel in a proceeding to terminate parental rights, it follows that the right to counsel is not constitutionally required during a shelter-care hearing, which determines only whether a minor requires temporary placement outside the home. This view is supported by the case of *In re Polovchak* (1983), 97 Ill. 2d 212, 454 N.E.2d 258, where the supreme court gave no indication that the parent's lack of counsel at a hearing where the trial court appointed a temporary custodian of the minor constituted a violation of due process.

■ Baker also argues that section 2—15 of the Juvenile Act provides that a parent "is entitled to have an attorney present at the hearing on the petition." (Ill. Rev. Stat. 1989, ch. 37, par. 802—15(2).) However, the "hearing" referred to in section 2—15 is one in which a final determination on the petition is made, not the shelter-care hearing. Sections 3—11 and 3—12 of the Juvenile Act, which refer to shelter-care hearings and the notice required for those hearings, do not mention any right of counsel for respondents. Ill. Rev. Stat. 1989, ch. 37, pars. 803—11, 803—12.

Accordingly, the decision of the trial court is affirmed.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.