THIRD DIVISION

June 30, 1998

No. 1--97--0759

IN THE INTEREST OF LAKITA B., JAMAL H., ) Appeal from the

WILLIAM J., LAVERT J., and MALIK H., ) Circuit Court of 

) Cook County.

Minors-Respondents-Appellees. )

) 

(THE PEOPLE OF THE STATE OF ILLINOIS, ) 

) 

Petitioner-Appellee, )

)

   v. )

) 

BARBARA B., ) Honorable

) Stephen Y. Broadhay,

Respondent-Appellant). ) Judge Presiding.

JUSTICE BURKE delivered the opinion of the court:

Following an adjudicatory hearing on the State's petitions for adjudication of wardship of Lakita B., Jamal H., William J., Lavert J. and Malik H. (minors), the circuit court found the minors to be neglected and abused pursuant to section 2--3 of the Juvenile Court Act (Act) (705 ILCS 405/2--3(1), (2) (West 1992)), and at a subsequent dispositional hearing, as required by section 2--22 (705 ILCS 405/2--22 (West 1992), adjudicated all of the children wards of the court and found that their mother, respondent Barbara B., was unfit and unable to care for, protect, train or discipline the minors for other than financial reasons pursuant to section 2--27 of the Act (705 ILCS 405/2--27 (West 1992)).  On appeal, respondent contends that the trial court's finding that she was unfit to care for, protect, train or discipline her children was against the manifest weight of the evidence.  For the reasons set forth below, we affirm.

On March 25, 1995, respondent's live-in boyfriend, Tony Harris (Harris), poured rubbing alcohol and charcoal fluid on respondent's 10-year-old son, William J., and set him on fire.  As a result of Harris' acts, William J. sustained "70% total body-surface-area burn" and had several surgeries.  Thereafter, the State filed petitions for adjudication of wardship, requesting that the trial court adjudicate William J. and respondent's other children, Lakita B., Jamal H., Lavert J., and Malik H., wards of the court.  Harris was subsequently sentenced to 75 years' imprisonment.   

An adjudicatory hearing on all petitions was held on March 27, 1996.  Edward Schultz, a child protective investigator for the Illinois Department of Children and Family Services (DCFS), testified that he had an interview with the minor, Lakita B., during which Lakita had told him about the March 25 incident involving her and her brother William.  Lakita told Schultz that respondent had become very upset that night after she realized that her food stamps had been stolen.  According to Lakita, William admitted to respondent that he had taken the food stamps.  Lakita further stated that she and William had both been "on punishment" that night, which meant that they were not allowed to have dinner.  Lakita also stated that William took the food stamps "so he could buy food when he was hungry."  

When Harris came home later that evening, Lakita heard respondent tell Harris, "Them [expletive deleted] done stole my money."  Harris began yelling and screaming and throwing things around the house, and he told Lakita and William to leave the house.  Lakita told Schultz that she and William left and stood out in the hallway "as they had no place to go."  After a short while, Harris opened the door and told Lakita and William to get back in the house and tell him who stole the food stamps.  Lakita told Harris that she did not take the food stamps, but William remained silent.  Harris then said, "We are going to do this the way the Indians used to do it when people tell lies!"  Thereafter, Harris inserted one end of a toilet paper roll down Lakita's collar and "made a trail" of the toilet paper to William where he fastened the other end of the toilet paper.  Harris poured rubbing alcohol on the toilet paper and on the chest and shoulder areas of the minors.  Respondent was present at this time, but "did not do anything."  Harris kept asking, "Who stole the money?"  When Harris lit Lakita's piece of toilet paper with a lighter, Lakita "quickly pulled it out and stamped it out."  

Harris left the minors at one point and came back with a bottle of charcoal fluid which he poured on Lakita and William.  At this time, respondent tried to grab the bottle of fluid away from Harris "and stop him," and Lakita and respondent were both crying and yelling for Harris to stop.  Harris then told the children that "whoever moves first is the one who is lying."  Harris took out a lighter and kept flicking the lighter near William's shoulder and then near Lakita's shoulder, but the lighter would not light.  Harris then took a piece of paper, lit the paper on the stove and came back to William, who was "frozen and trembling" and could not respond to Harris' repeated question about who stole the money.  According to Lakita, Harris then touched the lit paper to William's collar and "William was ablaze!"  Thereafter, respondent "went to the sink to get some water to put William out," and then went to a neighbor's home to call the police.  Lakita also told Schultz that she and William were "hit on the head" that night when Harris came home, and that Harris and respondent had whipped her with a belt on past occasions.      

Schultz also testified to the content of an interview he had with respondent.  Respondent first told Schultz that she wanted the children to stay with her and that "the whole incident was an accident."  When Schultz asked respondent why she did not do anything when Harris poured alcohol on the children, respondent claimed that she went to tend to another crying child and she knew that Harris would never hurt William and Lakita "in a million years."  Respondent admitted that Lakita and William were "on punishment" and had not eaten dinner in two nights.

After hearing all the evidence, the trial court found that Lakita, Jamal, William and Lavert were "abused or neglected" based on an "injurious environment" and substantial risk of harm as a result of the conduct of both respondent and Harris pursuant to section 2--3 of the Act.  The court found that Malik, if left in the care of respondent and/or Harris, would also be subject to substantial risk of harm.  The court also found that the conduct perpetrated by both Harris and respondent on March 25 constituted torture as to Lakita and William.  The court stated that even though there was no conclusive evidence that respondent had been present in the room at the moment William was lit on fire, the fact that she was present when Harris poured a toxic substance on the children was sufficient evidence for a finding of torture.  

On September 6, 1996, the Public Guardian filed a motion for a finding of unfitness against respondent pursuant to section 2--27(1) of the Act.  At the dispositional hearing on January 21, 1997, Richard LaBrie, director of C.A.U.S.E.S., testified that his agency was hired by DCFS to provide psychotherapy services to respondent.  LaBrie stated that respondent claimed that she had been a victim of domestic violence perpetuated by Harris for two years.  According to LaBrie, respondent told him that she had observed Harris physically abusing another child of his from a previous marriage prior to the March 25 incident.  LaBrie also stated that respondent had made a "commitment" to meeting with her therapist every week and was willing to disclose personal information.  LaBrie believed that respondent had "developed some insight" into her own history of child abuse in relation to her relationship with Harris.  According to LaBrie, respondent had been making "some progress in understanding her role in the events that led to her son being injured."  LaBrie further stated that respondent had "always" indicated that her relationship with her children was important to her and that she wanted them to return to her.  LaBrie, however, did not recommend that respondent resume guardianship of the minors  because he believed there were "serious and significant issues" that needed to be addressed regarding respondent's own treatment that would be relevant to her care of her children.   LaBrie also testified that there had been some progress in respondent's ability to understand her "impaired judgment" regarding Harris' intent to cause harm to her children as being a product of respondent's own physical victimization as a child.  LaBrie recommended continued treatment for respondent and stated there was "a lot of work to do" because issues that would cause concern about her capacity to exercise good judgment in the care of her children were "still active issues."  LaBrie further stated that despite respondent's progress, he "certainly" could not state that respondent "has that judgment today." 

Four other social workers who worked on respondent's and/or the minors' cases testified at the hearing.  Dawn Pettway, a DCFS caseworker, testifed that although respondent's visits with her children had been "very appropriate," and she was regularly attending parenting classes, Pettway nonetheless did not believe the children should return to respondent's custody "at this point in time."  Silver Edosio, an employee of Habilitative System Incorporation, testified that respondent's visits with the children had been "going very well," but that he would nonetheless recommend guardianship of the children to DCFS. Laura Stivers, a caseworker assigned to Malik, testified that although respondent had been "cooperative" regarding the special needs of Malik as a Down's syndrome patient, it would not be in Malik's best interest to be returned home.  Kelly Saccomando, program manager at Maryville Academy, testified that respondent visited Lakita at least one weekend a month and had also made special visits when needed.  When asked about the withholding of food from Lakita by respondent, Saccomando replied that her "impression" was that such acts were performed mostly by Harris than by respondent.

A psychological evaluation of respondent was admitted into evidence.  The evaluation revealed that respondent had continued to visit Harris in jail;  respondent admitted that her children were usually punished by withholding food from them or hitting them with a belt; and respondent was intelligent, loved her children and wanted her children back.  The evaluation also stated, however, that because respondent did not seem to understand the severity of her own role in her children's abuse, it was not clear that she would be able to protect them in the future.

At the conclusion of the hearing, respondent's attorney stated:

"And we're asking the Court at the present time to, A, find that she's willing.  B, there's evidence that she's unable because of limitations she has, impaired judgment, which is--which there was a breakthrough being made in connection with.  And that this matter be reviewed again down the line.

I'm saying to the Court, and you know I'm saying to my client, I believe based on what we've heard today, the Court could easily conclude you're not able to do so.

***

And for these reasons, I ask that obviously the Court not find her to be unfit.  At the very most, find her to be willing, but unable at the present time."  

After closing arguments, the trial court found that both Harris and respondent were responsible for the March 25 "torture" of William and Lakita, and that it was in the best interest of the minors that they be adjudged wards of the court.  The court was "clearly convinced" that respondent was unfit to care for, protect and train the minors, "regardless of how willing she might be."  The court acknowledged that it faced a "difficult task" in making an appropriate finding without "destroying any and all hope for this family."  The court considered the evidence that respondent was participating and cooperating in services.  However, the court stated that the "egregious" nature of the events that occurred and the fact that respondent made statements to "various people" that the incident was an "accident," required a finding of unfitness against respondent "regardless of what has happened since then."  The court further stated that, "[b]ased upon the incident that occurred in this case and everything that this Court has learned since then, this Court cannot think of any situation in which it would consider returning these children to [respondent] based upon the conduct that has been testified to."  Accordingly, the court entered an order, pursuant to section 2--27 of the Act, finding respondent unfit and unable for some reason other than financial circumstances alone to care for, protect, train or discipline all five of the minors, and granted DCFS the right to place the minors.  This appeal followed.

Respondent contends that the trial court's finding that she was unfit under section 2--27(1) of the Act was erroneous.  The Public Guardian contends that the issue of whether respondent was unfit under the Act is moot because respondent's attorney conceded at the conclusion of the dispositional hearing that respondent was "unable" to care for the minors.  The Public Guardian argues, therefore, that because the legislature placed the words "unfit," "unable" and "unwilling" in disjunctive phrases in section 2--27(1) of the Act, it is clear that the trial court needed only to base its order on one of the three findings, which it did in ruling that respondent was "unable" to care for the minors, thereby rendering respondent's argument as to the unfit finding moot.  Respondent counters that whether her argument at the dispositional hearing was a "concession on the issue of [her] ability to be a parent," that "concession" is not relevant to the specific issue on appeal regarding whether the trial court's finding of unfitness was against the manifest weight of the evidence because she "has not raised the issue of inability."  Respondent maintains, without citation to authority, that because she has raised the issue of the trial court's finding of unfitness, this court should consider this issue only, "[i]f not solely for the purpose of this case, then for purposes of the many litigants to follow the appellant," and "[t]the court's ruling on this *** will provide much useful and needed guidance to the courts and litigants who struggle daily with the meaning of fitness."

In order to preserve a question for review, a party must make an appropriate objection in the court below, and failure to object constitutes a waiver.  
Hargrove v. Gerill Corp.
, 124 Ill. App. 3d 924, 929, 464 N.E.2d 1226 (1984).  In the case at bar, it is undisputed that respondent has not raised on appeal the issue of the trial court's finding that she was "unable" under section 2--27 of the Act.  Respondent's notice of appeal specifically requests our reversal of "the Circuit Court's ruling concerning her fitness," and makes no reference to the court's finding of her inability to care for the minor children.  Because of respondent's failure to object to such a finding and her concession that evidence established that she was unable at the time of the dispositional hearing to effectively care for the minors, respondent has waived the issue on appeal of the trial court's finding that she was unable to care for the minor children.  

We next determine whether respondent's waiver of this issue moots the issue of whether the trial court erred in finding respondent unfit.  "A case is moot when it does not involve any actual controversy" (
LaSalle National Bank v. City of Chicago
, 3 Ill. 2d 375, 378, 121 N.E.2d 486 (1954)), and the decision of a reviewing court can have no practical effect on the parties (
In re J.M.
, 170 Ill. App. 3d 552, 556, 524 N.E.2d 1241 (1988)).  Section 2--27(1)(d) of the Act provides:

"(1) If the court determines and puts in writing the factual basis supporting the determination of whether the parents *** of a minor adjudged a ward of the court are unfit 
or
 are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor 
or
 are unwilling to do so, and that it is in the best interest of the minor to take him from the custody of his parents, *** the court may at this hearing and at any later point:

***

(d) commit him to the Department of Children and Family Services for care and service."  (Emphasis added.)  705 ILCS 405/2--27(1)(d) (West 1992).

In construing the above statute, this court must ascertain and effectuate the legislative intent, which should be discerned solely from the statutory language when that language is certain and unambiguous.  
Advincula v. United Blood Services
, 274 Ill. App. 3d 573, 581, 654 N.E.2d 644 (1995).  While disjunctive words such as "or" are sometimes misused by legislators, the literal meaning of such terms should be followed unless in doing so the meaning of the statute would become questionable or the statute would be rendered inoperable.  
Advincula
, 274 Ill. App. 3d at 581.  The choice of the disjunctive term "or" between other terms in a statute gives rise to the reasonable inference that the legislature intended that the terms be viewed in the alternative.  
Webb v. County of Cook
, 275 Ill. App. 3d 674, 678, 656 N.E.2d 85 (1995).  

Based on a plain reading of section 2--27, we believe that, although the Act does not specifically define "unable," "unwilling" or "unfit," the terms nonetheless have separate meanings.  By wording the terms in the disjunctive, the legislature intended that custody of a minor can be taken away from a natural parent if that parent is adjudged to be 
either
 unfit 
or
 unable 
or
 unwilling.  Because respondent here concedes that the trial court properly found her unable pursuant to section 2--27, this factor alone as a basis for the trial court's judgment is sufficient to support the trial court's judgment and, therefore, the issue of the trial court's additional finding that respondent was unfit, is moot.   Moreover, even if the issue of respondent's unfitness was not moot, we would reject her argument that the trial court's unfitness finding was against the manifest weight of the evidence.  Respondent argues that the trial court's finding of unfitness was erroneous (1) because the court attributed to respondent "a much greater role in the infliction of the abuse than is supported by the evidence; and (2) the evidence showed that respondent was "demonstrating both a willingness and an ability to be a responsible parent."  The State and the Public Guardian contend that sufficient evidence was presented supporting the trial court's section 2--27 determinations.

At the adjudication hearing, the trial court found the minors abused and neglected.  Section 2--3(1)(a) and (b) of the Act defines a "neglected" minor as, 
inter
 
alia
, "any minor under 18 years of age who is not receiving the proper or necessary support, *** or other care necessary for his or her well-being, including adequate food, clothing and shelter" or any minor "whose environment is injurious to his or her welfare."  705 ILCS 405/2--3(1)(a), (b)  (West 1992).  An "abused" minor includes, 
inter
 
alia
, any minor whose parent "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function."  705 ILCS 405/2--3(2)(ii) (West 1992).  

Under section 2--23(1)(a) of the Act, a minor found to be "neglected" or "abused" under section 2--3 may be "placed in accordance with Section 2--27" of the Act.  705 ILCS 405/2--23(1)(a) (West 1992).  Section 2--23(1)(a) further provides that, "in any case in which a minor is found by the court to be neglected or abused under Section 2-3 of this Act, custody of the minor shall not be restored to any parent *** until such time as a hearing is held on the issue of the best interests of the minor and the fitness of such parent *** and the court enters an order that such parent *** is fit to care for the minor."  705 ILCS 405/2--23(1)(a) (West 1992).  

A parent's fitness "may be put in issue in several ways" under the Act.  
In re P.F.
, 265 Ill. App. 3d 1092, 1100, 638 N.E.2d 716 (1994).  Under section 2--23 of the Act, when the trial court determines that a child is neglected, custody may not be returned to the parents until the court finds that the parents are fit; the standard of proof for a section 2--23 finding is a preponderance of the evidence.  Conversely, a finding of unfitness pursuant to section 2--13 and 2--29 of the Act which governs the termination of parental rights, results in "a final and complete severance of the child from the parent," and requires clear and convincing evidence. 
In re P.F.
, 265 Ill. App. 3d at 1100-02.  In the present case, because the trial court's section 2--27 finding of unfitness is not a complete termination of all parental rights as is effected by a section 2--13 or 2--29(2) finding of unfitness that operates as a final and complete severance of the minor from the parents, the standard of proof is a preponderance of the evidence.  See 
In re P.F.
, 265 Ill. App. 3d at 1100-08.  

On review of a trial court's 2--27 determination of unfitness, the trial court "will be reversed only if the findings of fact are against the manifest weight of the evidence or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order."  
In re T.B.
, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893 (1991).  The trial court's finding is against the manifest weight of the evidence if a review of the record "clearly demonstrates" that the opposite result was proper.  
Because the trial court is in a much better position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings "merely because the reviewing court might have reached a different decision."  
In re T.B.
, 215 Ill. App. 3d at 1062.  Moreover, due to the "delicacy and difficulty of child custody cases," it is well settled " 'that wide discretion is vested in the trial judge to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied.' "  
In re D.L.
, 226 Ill. App. 3d 177, 185, 589 N.E.2d 680 (1992), citing 
In re Martin
, 31 Ill. App. 3d 288, 293, 333 N.E.2d 711 (1975). 

Respondent argues that the court failed to consider that Harris actually inflicted the abuse against William and Lakita and that respondent's "status as a victim of domestic violence *** may have interfered with her ability to *** intercede and risk physical injury to herself."  Respondent further argues that, aside from the March 25 incident, there were no other "specific" allegations of other abuse against her, aside from "mention at trial" that the minors would be deprived of food as punishment; however, Saccomondo testified that it was Maryville Academy's impression that such acts were performed more by Harris than by respondent.  Specifically, respondent argues that the court did not consider Schultz's testimony regarding Lakita's statements that on March 25 respondent tried to stop Harris, was "crying the entire time," got water to soothe William's burns, ran to the neighbor's for help and held William after he had been burned.  Respondent further argues that nothing in the record indicates that she assisted or counselled Harris to abuse the children, or that she could have foreseen his "murderous" reaction to her words, "[t]hem [expletive deleted] done stole my money."  

The State argues that there is sufficient evidence in the record supporting the trial court's finding, under section 2--27, that respondent was unfit to protect and care for the minors based upon respondent's continued assertion that the incident was an "accident" and respondent's failure to make any significant attempts to stop Harris' abuse of the minors either before or during the March 25 incident.  Specifically, the State argues that respondent "provoked her paramour into setting her children on fire, failed to prevent the resulting torture, defended and supported him thereafter, and refused to accept any responsibility for this tragedy even two years later."

We first note that respondent fails to cite to any authority in support of her assertions that her "status" as a victim of abuse or the fact that the acts of abuse against the minors were performed "more" by Harris than by respondent warrant a finding that the trial court's unfitness determination was against the manifest weight of the evidence.  It is well settled that "neglect" of a minor under section 2--3(1)(b) of the Act "is the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duties," and that "[b]ecause an injurious environment is an amorphous concept that cannot be defined with particularity, each case should be reviewed considering its specific circumstances."  
In re Ashley F.
, 265 Ill. App. 3d 419, 424, 638 N.E.2d 368 (1994), citing 
In re S.D.
, 220 Ill. App. 3d 498, 502, 581 N.E.2d 158 (1991).  Respondent's argument that nothing in the record indicates that she either counseled Harris or could have foreseen his acts against the minors is contradicted by her own testimony that she witnessed Harris abusing one of his children prior to the March 25 incident.  Additionally, the evidence established that respondent would whip the minors with belts and punish them by denying them food, respondent had told Harris about the stolen food stamps and respondent made no substantial efforts to stop Harris from severely abusing the minors.  Accordingly, we would conclude that the trial court's specific finding that 
both
 Harris and respondent perpetrated the torture upon William and Lakita was not against the manifest weight of the evidence.  The trial court's finding that Harris' acts in the presence of respondent that led to the burning of William, an act which, in the court's opinion, required planning and took a "period of time" to complete, as well as the other evidence presented, was sufficient proof by a preponderance of the evidence that respondent was unfit to care for her children.   

We next address respondent's argument that it is clear "from the language used by the court" that it based its determination solely on the abuse of William and Lakita that occurred on March 25, regardless of the fact that the court heard from other witnesses who had "some very remarkable things to say about [respondent]."  Respondent asserts that the legislature did not intend that the abuse suffered by a child be the sole factor in determining parental fitness under the Act because, "[i]f it were, then the legislature certainly would not have provided for dispositional hearings as it has in *** [section] 2--27."  Respondent further argues that the court failed to consider the testimony that she was making progress in her various forms of counselling, and that there is "[n]o doubt that part of being a fit parent is the desire and willingness to strive to be a better parent." 

The State and Public Guardian contend that the court did consider all the testimony in making its finding that respondent was unfit.  The Public Guardian specifically argues that the very fact that respondent was present during Harris' acts which were directed against William and Lakita was proof that respondent was unable to care for the minors.
(footnote: -6)  

Section 2--27 of the Act specifically provides:

In making a determination under this Section, the court shall also consider whether, based on the best interests of the minor, appropriate services aimed at family preservation and family reunification have been unsuccessful in rectifying the conditions that have led to a finding of unfitness or inability to care for, protect, train, or discipline the minor, or whether, based on the best interests of the minor, no family preservation or family reunification services would be appropriate."  705 ILCS 405/2--27(1) (West 1992).

The Act also requires the trial court to "consider all reports, *** which would assist the court in determining the proper disposition for the minor." 
In re L.M.
, 189 Ill. App. 3d 392, 400, 545 N.E.2d 319 (1989).     

This court has, on previous occasions, determined the issue of whether a trial court's order removing the custody of a minor from his or her parent pursuant to sections 2--23 and 2--27 was against the manifest weight of the evidence when the record contained testimony from social workers who made positive remarks regarding the parent's progress in counseling and therapy programs or their general willingness to be a "good" parent.  For example, in 
In re P.F.
, the respondents argued that the trial court's finding that they were unable to care for their minor children pursuant to section 2--23 of the Act was against the manifest weight of the evidence because reports and witness testimony showed that the respondents "could be adequate parents."  In 
In re P.F.
, a DCFS worker had found the respondents' family living in an unheated basement with no hot water, food or cooking facilities.  Psychiatric reports were filed with the court stating that the respondent mother denied that there was any problem with the fact that neither she nor her respondent husband worked.  However, the mother testified that she had been attending counseling once a week to help her prepare for the return of the minors, and that she was willing to continue that therapy.  An expert in child and clinical psychology testified that because the respondents were aware that they provided the minors with an unsafe environment and they were sincere about their desire to improve parenting, reunification of the family after continued therapy would be in the best interest of the minors.      

The 
In re P.F.
 court held that "even if the parents' characterization of the many reports and witnesses who said they should not have custody of the children is accurate on the specific point of future ability to parent, it is legally irrelevant" because the best interest of the child is the controlling standard and not the adequacy of the natural parents.  The court also held that the respondents' assertion that no witness testified that they could never be adequate parents did not provide grounds for reversal of the trial court's best interest determination.  
In re P.F.
, 265 Ill. App. 3d at 1108-09.  See also, 
In re T.B.
, 215 Ill. App. 3d at 1064-65 (affirming the trial court's dispositional order placing guardianship with DCFS where social workers testified regarding the respondent's "strong desire" for reunification of the family, yet not one report recommended that custody be returned to the respondent).

Additionally, the court in 
In re A.D.
, 199 Ill. App. 3d 158, 556 N.E.2d 799 (1990), similarly upheld the trial court's determination that the respondent was " 'unwilling or unable' to care for her children, as those terms are used in section 2--27 of the *** Act," at the time of the dispositional hearing after a finding of neglect based upon the sexual abuse of one of the minors performed by the minor's stepfather.  At the dispositional hearing, the court heard evidence from the respondent's social worker who testified that the respondent was willingly participating in parenting classes and seeking sex abuse counseling, and that she no longer denied that the sex abuse had occurred.  The respondent also testified that she was attempting to "come to terms" with her own incidents of physical and sexual abuse.  A report from DCFS, however, established that while the respondent had begun counseling, she "ha[d] significant issues to resolve before she will be capable of protecting the children," including her denial that the sexual abuse occurred and "her role in the perpetration of the sexual abuse, including her dependency/passivity."  Although the trial court determined that the respondent had made "commendable progress," the court nonetheless adjudicated the minors as wards of the court and appointed DCFS as their guardian because the court concluded that the respondent "had more to learn about being a good parent."  
In re A.D.
, 199 Ill. App. 3d at 158-162.  The 
In re A.D.
 court upheld the trial court's appointment of guardianship to DCFS, reasoning that, "[w]hen, as here, a child has been subjected to sexual abuse at the hands of a resident of that child's home, the court ought to remove that child (and any siblings similarly found to be neglected or abused) *** and return them only when the court is confident that the risk of sexual abuse has been eliminated."  
In re A.D.
, 199 Ill. App. 3d at 161.  See also, 
In re W.B.
, 213 Ill. App. 3d 274, 571 N.E.2d 1120 (1991) (holding that the trial court did not abuse its discretion in awarding custody of the minor to the natural mother and not the respondent, notwithstanding the trial court's "admittedly difficult decision" regarding the best interests of the minor).

The record in the case at bar, like the record in 
In re P.F.
, contains testimony that respondent had been voluntarily attending therapy sessions and displayed both a willingness to improve parenting and a desire for reunification of her family.  However, the trial court's finding of inability and unfitness in the present case, like the trial court's finding of inability in 
In re P.F.
, was also influenced by testimony from social workers who claimed that it would be in the best interest of the minors to remove them from the custody of respondent, and testimony that respondent, 
at the time of the dispositional hearing, still denied the seriousness of her acts or omissions toward the minors.  Moreover, in this case, as in 
In re T.B.
, not one social worker or report recommended that custody of the minors be returned to respondent, 
at the time of the dispositional hearing
, despite respondent's progress in therapy and desire for return of her children and opinions from several social workers that 
future
 counseling may warrant return of custody.  Additionally, here, as in 
In re A.D.
, the trial court was undoubtedly influenced by testimony from DCFS professionals who stated that respondent had "serious and significant" issues to address regarding her role in the abuse, her own incidents of abuse and her continued assertion that the incident was an "accident."  In light of 
In re P.F.
 and 
In re A.D.
, we would conclude that respondent's argument that 
the trial court's finding of her unfitness is against the manifest weight of the evidence because it did not properly "consider" testimony that respondent's continued counseling and therapy evidenced a capability and desire to be a good parent, is without merit.

We would further find respondent's assertion that the trial court did not consider all the testimony is unsupported by the record.  In fact, the record shows that the trial court considered  respondent's and Harris' culpability when determining that both were culpable for the abuse inflicted upon the minors; considered respondent's progress in DCFS' programs since the March 25 abuse to the minors occurred; and specifically acknowledged that in light of all the testimony in the case, it was faced with a "difficult" task in determining the best interests of the minors.  Therefore, we would
 not disturb the trial court's finding of unfitness in the best interests of the minors, notwithstanding the fact that the court admittedly acknowledged the difficulty of determining the appropriate disposition in light of the egregiousness of the abuse, including respondent's treatment of the minors before the March 25 incident and her actions during the March 25 incident, as well as testimony regarding respondent's subsequent progress in counseling and treatment.

For the reasons stated, we affirm the judgment of the circuit court.

Affirmed.

LEAVITT, P.J., and GORDON, J., concur.

FOOTNOTES
-6:
The Public Guardian, having taken the position that the issue of the trial court's finding that respondent was unfit is moot, directs his argument solely to the court's finding that respondent was unable to care for the minors as an alternative argument should this court review that finding.