*In re* E.S. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Tammy Shreve, Respondent-Appellant).

Fourth District   No. 4—01—0153

Opinion filed September 10, 2001.

Daniel B. Kennedy, of Champaign, for appellant.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert J.

Biderman, and James C. Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MYERSCOUGH delivered the opinion of the court:

In February 2001, the trial court entered a dispositional order awarding custody of E.S. (born April 18, 1987) to his father, Everett Shreve, and awarding custody of R.S. (born December 15, 1996) to the Department of Children and Family Services (DCFS). Respondent mother, Tammy Shreve, appeals, arguing that (1) the trial court's finding that it was in the best interests of E.S. to place him in the custody of his father was against the manifest weight of the evidence, and (2) the trial court lacked jurisdiction over R.S. We affirm.

## I. BACKGROUND

In October 2000, the State filed a two-count petition for adjudication of wardship (petition) alleging, *inter alia*, that the minors were neglected pursuant to section 2—3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2—3(1)(b) (West 2000)) because they resided in an environment injurious to their welfare: specifically, when the minors resided with their mother, they were exposed to the risk of physical harm and substance abuse. On October 2 and 3, 2000, the trial court conducted a shelter-care hearing. The trial court heard testimony that respondent was highly intoxicated in a hotel room with the minor children. E.S. called the police because respondent was yelling at one of the children and E.S. was scared. The police officers took E.S. and R.S. into protective custody because they felt that respondent lacked the ability to care for the minors in her intoxicated condition. The trial court also heard testimony that respondent became pregnant with R.S. by artificial insemination. Rachel Braunigan, child welfare specialist with DCFS, testified that she learned of two indicated reports from Kentucky involving respondent—in the fall of 1998, emotional abuse to E.S., and in December 1997, physical abuse to A.S. (respondent's daughter who is not part of this case). At the close of evidence, the trial court found probable cause to believe that E.S. and R.S. were neglected. In addition, the trial court found that it was a matter of immediate and urgent necessity that a temporary custodian be appointed and awarded DCFS temporary custody of E.S. and R.S.

In November 2000, the trial court admonished Everett as to the allegations in the State's petition. Specifically, the trial court admonished Everett that the State filed a petition naming him the father of E.S. and R.S. Everett informed the trial court that he was the father of E.S. only. At that point in the hearing, respondent's attorney stated: "We discussed that at the last court hearing. [R.S.] was

born by artificial insemination. There is no father." The State then moved to amend the petition to list the father of R.S. as unknown. The trial court then noted that Everett was the father of E.S. only, delayed amending the petition further until such time as the court had more information, and completed the admonitions.

On December 29, 2000, the trial court conducted an adjudicatory hearing. Respondent agreed to admit and stipulate to count II of the petition—that the minors are exposed to an injurious environment when with respondent due to her substance abuse. The State withdrew count I of its petition (neglected due to risk of physical harm). The parties agreed to tender to the court the shelter-care report prepared in October 2000, as an adequate factual basis for the admission and stipulation. Everett waived his right to an adjudicatory hearing. The trial court accepted the admission and stipulation and found E.S. and R.S. neglected minors because when they resided with respondent they were exposed to substance abuse. 705 ILCS 405/2—3(1)(b) (West 2000).

On January 8, 2001, the State filed an amended petition listing the father of R.S. as follows: "unknown; via anonymous sperm donor." On January 18, 2001, the trial court filed its written adjudicatory order. On January 29, 2001, the trial court conducted the dispositional hearing. Everett testified that he lives in Kittanning, Pennsylvania. He has been married for eight years. He and his wife live in a three-bedroom home overlooking the Allegheny River. Everett and his wife would like E.S. to come live with them. E.S. would attend the middle school that is located less than one mile from the house, and E.S. could participate in programs and activities in the neighborhood. Everett is employed as a quality engineer with Penn United and earns approximately $40,000 per year. He has health insurance and has listed E.S. on his policy. Everett is aware that E.S. has been diagnosed with attention-deficit disorder and informed the court that counseling would be available for E.S. in Pennsylvania.

Everett testified that he did not have contact with E.S. for a long period of time. When he was first divorced, he sent cards and letters to E.S.; but in 1991, the cards were returned with no forwarding address. He inquired about respondent's whereabouts but in 1993 lost contact with them because they moved and left no forwarding address. He pays child support through the circuit clerk's office in Terre Haute, Indiana, but that office would not give him an address for respondent. He learned of E.S.' whereabouts in early 2000 when he was informed that a case had been filed against respondent involving the minors. He hired an attorney and was present for the hearing, but the case was dismissed because the charge was too broad. It was not until this case

arose that Everett reestablished contact with E.S. Since then, Everett has been visiting with E.S. approximately once a month. Everett would like to build a relationship with E.S., and E.S. expressed an interest in living with Everett.

Everett testified that he has no criminal convictions or charges filed against him. He acknowledged that when he was married to respondent, some domestic violence occurred for which he attended and completed counseling. No domestic violence has occurred in his current marriage. He testified that he did not have an alcohol problem when he was married to respondent and does not presently have a problem. Everett and his wife live alone in their home. In the past, however, two of his wife's children resided with them—a daughter for six years, and a son for three years.

Everett's wife, Margaret, testified that she and Everett have the income, ability, and other basics necessary to take care of E.S. She does not have any problem with E.S. maintaining contact with R.S. and would probably encourage E.S. to do so. She does not have any criminal convictions and has never been found unfit to care for a child.

The trial court received the dispositional report prepared by Jennifer Martin with DCFS. The report indicated that respondent was married and divorced twice. Respondent reported that her marriage with Everett involved domestic violence. She and Everett divorced in 1990, and the divorce decree allowed Everett no contact with the children due to past violence. Respondent reported, though, that Everett was not present at the divorce hearing and presented no evidence on his behalf.

Respondent later married Michael Walker, who was unable to have any children. She was, therefore, artificially inseminated and gave birth to R.S. Respondent apparently provided some kind of documentation to DCFS that Michael went into court in Arizona and claimed that he was not R.S.' biological father and that he was not aware of the artificial insemination. In addition, respondent told DCFS the divorce order states that Michael was not legally responsible for R.S.

The report further indicates that respondent had prior involvement with social services in Kentucky where, in the fall of 1998, her children were removed from her care due to an allegation of neglect. In addition, in August 1999, in Indiana, there was a report that respondent could not control E.S. and that E.S. continued to run away from home. Reports documented that respondent refused to pick up E.S. from the youth detention center. Respondent told DCFS that E.S. was the cause of her problems and that she blamed the removal of her children on him.

The report also indicated that Everett was honorably discharged from the military, where he had enlisted in the military police. He earned a bachelor's degree in business administration. He was not involved in the neglect that precipitated the present case and wants to be a placement resource for E.S. Everett travels to Illinois at least once a month to visit with E.S. Everett writes E.S. regularly and provides him with prepaid phone cards to enable E.S. to call him.

At the last review hearing, DCFS rated respondent unsuccessful at demonstrating her ability to provide a safe environment. DCFS encouraged respondent to seek employment to become financially independent. Respondent informed DCFS that she applied for disability based on her mental health issues. Respondent is receiving mental health counseling, but her therapist reported respondent is only making minimal progress. In December 2000, respondent exhibited threatening behavior toward her therapist. Specifically, she went "into a rage, pacing, and getting into the therapist's face." Respondent indicated that she was not aware that her behavior was threatening in any manner. This caused DCFS concern that respondent lacked insight into her own aggressive behaviors.

E.S., who is 13 years old, has expressed a desire to live with Everett. E.S. does not want to visit with respondent and told DCFS that "[h]is mother was playing a game." He believed that his mother would do whatever DCFS said until E.S. is returned and then she would start the violence again.

After hearing the evidence and argument of counsel and considering the dispositional report, the trial court found respondent and Everett unfit and unable for reasons other than financial circumstances alone to care for, protect, train or discipline the minors. In its decision, the trial court found that "[respondent] *** severely and consistently abuses alcohol and her significant anger problems are exacerbated by alcohol consumption. She lacks insight into her own actions and their consequences. Her life is chaotic; dysfunction appears to be ingrained. [Respondent] is not addressing her serious mental health issues." The court further found respondent unfit and unable to exercise either custody or guardianship of both minors. The court found Everett unable to exercise guardianship but found him fit, able, and willing to exercise custody of E.S. The court found that placing custody of E.S. with Everett would not endanger his health and safety and that it would be in E.S.' best interests to do so. The court ordered Everett and his current wife to cooperate fully with the Pennsylvania equivalent of DCFS. The trial court placed custody and guardianship of R.S. with DCFS and placed only guardianship of E.S. with DCFS.

This appeal followed.

## II. ANALYSIS

### A. Award of Custody of E.S.

Respondent does not challenge the trial court's determination of neglect. Instead, she initially contends that the trial court's finding that it was in the best interests of E.S. to place custody of him with his father, who lives in Pennsylvania, was against the manifest weight of the evidence in light of the trial court's finding that Everett was unfit to care for, protect, train, or discipline E.S. Specifically, respondent contends that only a fit parent can have custody of a child found abused or neglected. We agree that only a parent found fit can have custody, but we disagree that the trial court's placement of custody was against the manifest weight of the evidence.

•1 In child custody proceedings under the Juvenile Court Act (705 ILCS 405/1—1 *et seq.* (West 2000)), the best interests of the child are paramount, and the trial court is vested with wide discretion. *In re W.B.*, 213 Ill. App. 3d 274, 282, 571 N.E.2d 1120, 1126 (1991). The trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses and, therefore, is in the best position to determine the credibility and weight of the witnesses' testimony. *In re A.P.*, 179 Ill. 2d 184, 204, 688 N.E.2d 642, 652 (1997). The trial court is also in the best position to determine the best interests of a minor. *In re B.D.*, 321 Ill. App. 3d 161, 164, 746 N.E.2d 822, 825 (2001). The trial court is given broad discretion and great deference in matters involving minors. *B.D.*, 321 Ill. App. 3d at 164, 746 N.E.2d at 825. Therefore, the determination of the trial court will not be disturbed unless it is against the manifest weight of the evidence. *W.B.*, 213 Ill. App. 3d at 282, 571 N.E.2d at 1126.

•2, 3 Under the Juvenile Court Act, the trial court in a dispositional hearing determines whether it is in the minor's best interests to be made a ward of the court. 705 ILCS 405/2—27(1) (West 2000). The court also determines whether the minor's parent is fit to care for him (705 ILCS 405/2—27(1) (West 2000)) and whether custody of the abused or neglected minor should be restored to the parent (705 ILCS 405/2—23(1)(a) (West 2000)). Once a minor has been adjudicated a ward of the court based upon a finding of abuse, neglect, or dependency, the court conducts a dispositional hearing. After hearing evidence and argument by counsel, the trial court is permitted to enter a dispositional order. Dispositional orders are authorized by section 2—23 of the Juvenile Court Act (705 ILCS 405/2—23 (West 2000)), which states in part:

> "(1) The following kinds of orders of disposition may be made in respect of wards of the court:

(a) A minor under 18 years of age found to be neglected or abused under [s]ection 2—3 *** may be (1) continued in the custody of his or her parents, guardian[,] or legal custodian; (2) placed in accordance with [s]ection 2—27; *** or (4) ordered partially or completely emancipated ***."

Section 1—2 of the Juvenile Court Act (705 ILCS 405/1—2 (West 2000)) declares the purpose and policy of the Juvenile Court Act, in relevant part, as follows:

"(1) The purpose of this [a]ct is to secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal ***."

•4 After reviewing all of the evidence, the trial court determined it would be in E.S.' best interests to place his custody with Everett, noting that the "extremely rocky situation in which [E.S.] has been [with respondent] *** is not a recent development, this apparently has been going on for some time between him and his mother." We acknowledge that the trial court's written order found Everett unfit and unable for reasons other than financial circumstances alone to care for, protect, train, or discipline E.S. The trial court, however, also found Everett fit, able, and willing to exercise custody of E.S. and that it was in E.S.' best interests to award custody to Everett. Although at first blush it may appear that the findings conflict, they do not. The trial court clearly found Everett a superior placement resource to the other alternatives, i.e., return custody to respondent or award custody to someone other than a natural parent. The trial court's finding permits the trial court to retain jurisdiction and supervision over the case and permits DCFS to remain involved to monitor to the case. This is especially important, here, because Everett resides in Pennsylvania. The trial court's findings were not against the manifest weight of the evidence. Respondent and E.S. have a history of turbulence. Respondent continues to lack insight into her own actions and their consequences. Her life is chaotic. In contrast, the record demonstrates Everett's life is more stable, and he could provide E.S. with a more secure environment. Everett wants custody of E.S., and E.S. wants to reside with his father. When rendering its decision, the trial court acknowledged the past report of domestic violence against Everett but noted further the length of time that had passed since the allegation and that Everett's current marriage seems to be "as smooth as any marital relation-

ship." Based on the record, we conclude that the trial court's finding that it was in E.S.' best interests to award custody to Everett was not an abuse of discretion.

## B. Trial Court's Jurisdiction Over R.S.

Respondent next argues that the trial court lacked jurisdiction over R.S. because his father never received notice of the petition or any of the proceedings. Specifically, respondent contends that R.S. was born during respondent's marriage to Michael Walker. As such, respondent contends that Michael is presumed to be the father of R.S. pursuant to section 5 of the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/5 (West 2000)). The State argues, though, that this presumption may be rebutted or, alternatively, respondent should be estopped from raising the argument because it is wholly inconsistent with the position she took in the trial court. We agree with the State.

•5 In juvenile proceedings, due process requires adequate notice of the proceedings to a minor and his parents. *In re B.L.*, 315 Ill. App. 3d 602, 605, 734 N.E.2d 476, 478 (2000). A pleading in a juvenile proceeding that fails to name and notify the necessary respondents fails to invoke the jurisdiction of the court and thereby renders its orders void. *B.L.*, 315 Ill. App. 3d at 605, 734 N.E.2d at 478. The matter is forfeited, however, and diligence on the part of the State may be assumed, unless some question is raised in the circuit court regarding the failure to identify or locate a noncustodial parent whose identity or address is unknown to the State at the outset of the proceedings. *B.L.*, 315 Ill. App. 3d at 605, 734 N.E.2d at 478.

•6 Here, the State's petition listed respondent and Everett as the parents of both minors. The State amended the petition by interlineation, to reflect that Everett was the father of E.S. only. After respondent's attorney represented to the court that R.S. was conceived by artificial insemination and had no father, the State requested the petition be amended to show R.S.' father to be unknown. In January 2000, the State filed an amended petition listing R.S.' father as "unknown."

Initially, we note that the record does not indicate that the State published notice as to any unknown father. While the statute requires publication of notice as to all to whom it may concern (705 ILCS 405/2—16 (West 2000)), the statute does not address any notice requirement when an unknown, *i.e.*, anonymous, sperm donor is involved. We conclude, however, that no notice is required to be given to an anonymous sperm donor. Our determination is supported by section 3 of the Parentage Act (750 ILCS 40/3 (West 2000)). Specifically, section 3(b) of the Parentage Act provides:

"The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife *shall be treated in law as if he were not the natural father of a child thereby conceived*." (Emphasis added.) 750 ILCS 40/3(b) (West 2000).

Section 2—13(2) of the Juvenile Court Act requires that a petition initiating a juvenile proceeding shall contain "the names and residences of [the minor's] parents[,] *** legal guardian or the person or persons having custody or control of the minor." 705 ILCS 405/2—13(2) (West 2000). R.S. was conceived by artificial insemination via an anonymous donor who, pursuant to the Parentage Act, shall not be treated as R.S.' natural father. As such, he has no rights to R.S.; therefore, the State was not required to publish notice to any unknown father.

Throughout the proceedings in the trial court, respondent's position was that she conceived R.S. through artificial insemination via an anonymous donor and R.S. had no father. In addition, the record contains information that respondent produced documentation to DCFS that Michael was not R.S.' father. Respondent told DCFS that Michael walked into court in Arizona and told the judge that he was not R.S.' father and that he was not aware of the artificial insemination. In addition, respondent represented that her divorce decree from Michael stated that Michael was not legally responsible for R.S.

The trial court and the parties clearly proceeded based on those representations. In fact, at Everett's admonition hearing, respondent's attorney specifically informed the trial court that "[R.S.] was born by artificial insemination. There is no father." Respondent should not be allowed to argue on appeal a different posture of the case than she took in the trial court, namely moving from "there is no father" to Michael is "a presumptive father." In addition, a party cannot complain of error that she induced the court to make or to which she consented. *McMath v. Katholi*, 191 Ill. 2d 251, 255, 730 N.E.2d 1, 3 (2000). A party forfeits her right to complain of an error where to do so is inconsistent with the position taken by the party in an earlier court proceeding. *McMath*, 191 Ill. 2d at 255, 730 N.E.2d at 3. It is manifestly unfair to allow one party a second trial upon the basis of error that she injected into the proceedings. *McMath*, 191 Ill. 2d at 255, 730 N.E.2d at 3. We conclude, therefore, that we must affirm the judgment because respondent's position in the trial court, which was adopted by the trial court, is inconsistent with the one she now argues on appeal—namely, that Michael should have received notice because he is the presumptive father of R.S.

As noted, both respondent and her attorney repeatedly represented

to the court that R.S. had no father because she conceived R.S. through an anonymous sperm donor via artificial insemination. When the trial court and the State proceeded based upon those representations, respondent did not object or raise the issue of notice to Michael in the trial court—even when the State filed its amended petition listing R.S.' father as unknown. Respondent forfeited her notice argument for purposes of appeal because she failed to raise it in the trial court and raised it for the first time on appeal. In addition, we conclude that she is estopped from raising the notice argument on appeal because it is a position wholly inconsistent with the one she proffered in the trial court.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

McCULLOUGH and KNECHT, JJ., concur.