*In re* MONICA S., a Minor (The People of the State of Illinois, Appellant, v. Valerica S. *et al.*, Appellees).

First District (3rd Division)   No. 1—93—4028

Opinion filed June 30, 1994.

Patrick T. Murphy, Public Guardian, of Chicago (Kathleen G. Kennedy, of counsel), for appellant.

Rita A. Fry, Public Defender, of Chicago (Karen M. Florek, Assistant Public Defender, of counsel), for appellees.

PRESIDING JUSTICE TULLY delivered the opinion of the court:
On August 6, 1992, the Department of Children and Family Services (DCFS) filed a three-count petition for adjudication of wardship (hereinafter the Petition) of three-year-old Monica S. in the circuit court of Cook County pursuant to section 2—3(1)(b) of the Juvenile Court Act of 1987 (hereinafter the Juvenile Act) (705 ILCS 405/2—3(1)(b) (West 1992)). The Petition alleged Monica was a neglected

minor, *viz.*, Monica's father, Ioan S., had sexually abused her and that Monica's mother, Valerica S., was suffering from emotional problems which left her unable to care for Monica. The trial court found no sexual abuse and ordered Monica returned to her parents' custody. It is from the dispositional order returning Monica to her parents' custody that the office of the Cook County Public Guardian (hereinafter Public Guardian), on behalf of Monica, appeals to this court pursuant to Supreme Court Rule 301 (134 Ill. 2d R. 301).

For the reasons which follow, we affirm.

## FACTUAL BACKGROUND

At the adjudicatory hearing, Officer Clemente Aceviz of the Chicago police department testified that on June 15, 1992, he was dispatched to a domestic violence courtroom where he spoke to an assistant State's Attorney and Valerica in the presence of Monica. Aceviz recounted that Valerica told him that she had quarreled with Ioan on the previous day and that he had beaten her twice in a short period of time. Valerica then told Aceviz that Ioan told her that he was going to take the baby to sleep with him and that he picked up Monica, went into the bedroom, locked the door and went to sleep. Aceviz confirmed that supplemental police reports revealed that Valerica looked into the bedroom to check on Monica and that she observed that both Ioan and Monica were asleep and fully clothed.

Aceviz further testified that Valerica stated that she had called the police later in the day and that Ioan was arrested on her signed complaint. After the arrest, Valerica said that she took Monica into the bathroom to clean her up. Valerica then smelled a foul odor, noticed a smelly, sticky, substance on Monica's genitalia and observed what she believed were pubic hairs on Monica's reddened labia. Aceviz then took Valerica and Monica to Children's Memorial Hospital for an examination. The emergency room doctor informed Aceviz that the substance was semen.

Certified medical records of Monica from the hospital, dated June 15, 1992, were admitted into evidence. The Public Guardian published the emergency department form which contained a diagnosis by Dr. Sara Nussbaum that Monica had suffered sexual abuse.

The same emergency room document revealed that: Valerica stated that the bedroom door remained open while Ioan and Monica were sleeping; Valerica did not hear anything unusual; Valerica found hair on a tissue when she helped Monica in the bathroom with a bowel movement; later Valerica saw a sticky white discharge at Monica's vagina and a spot on her underwear; and Valerica did not clean the child in case the police needed to see her. The emergency

room genital examination revealed that: Monica's external and internal labia were swollen; no lacerations or bruising was found; Monica's hymenal opening was one to two millimeters; Monica's labia were reddened; the edges of the labia were smooth and without tears; and there was a sticky white discharge at her labia.

The pathology report for Monica from the hospital, dated June 16, 1992, was admitted into evidence and stated that the three slides of the white sticky substance submitted for screening revealed no sperm, only acute inflammatory cells, parabasil, and a few intermedial cells.

Denyce Ellis, a child protection investigator with DCFS, testified that she visited the family's home on June 15, 1992, and found it appropriate, clean and in order. During the visit, Valerica told Ellis that: Ioan had been drinking; Ioan had taken Monica to Burger King; Ioan had hit Valerica; Ioan would not allow her into the room where he fell asleep with Monica; she noticed something which appeared to be semen on Monica; she took her daughter to the police station; and Ioan was in jail. Ellis recounted that she did not take Monica into protective custody because Valerica appeared adequate and reported her concerns to the DCFS hotline and the police.

Ellis further testified that she went back to the home between 9:30 a.m. and 10:30 a.m. on August 4, 1992, for a follow-up visit, but Valerica would not allow her in. After returning to her office, Ellis learned that DCFS received another hotline call concerning Monica. The caller, a neighbor, expressed concern that Valerica was walking around the halls of the apartment building at night carrying a lit candle with a naked Monica in tow.

Ellis also testified that she met the police at the family's home later that same day at around 1 p.m. When Valerica refused to let them in, the police broke the door down and found the apartment in disarray. There was no food in the apartment. Furniture and paper were strewn about the floor. Monica, who was dressed only from the waist up, had paint all over her body. There was paint all over the walls. Valerica, who refused to talk to Ellis, yelled and tried to pull Monica away from the police when they took the child into protective custody. The police then transported Valerica to Ravenswood Hospital.

Valerica testified that on June 15, 1992, Monica asked Ioan to take her out for a soda. Valerica recounted that she asked Ioan to stay home as he had had a few beers and would have to cross a busy street to get the soda. In response, Ioan violently flung Valerica against a wall and strutted out with Monica. Valerica stated that when Ioan and Monica returned, Monica asked Valerica to go with

her into the bedroom. Valerica, who was upset, laid down in the living room and Ioan went with Monica into the bedroom. Valerica further testified that she did not see anything strange in the situation and that both Ioan and Monica were fully clothed.

According to Valerica, she confronted Ioan when he woke up sober and told him that she has to protect Monica. Ioan became upset and angry and frightened Valerica. Consequently, Valerica ran out of the house with Monica to a public telephone and called the police. When the police arrived, they went to the apartment with Valerica and Monica. Valerica informed the police that her husband had struck her. Ioan denied the charge, but the police arrested him. The following day, Valerica went to domestic violence court, met and spoke with Aceviz, and accompanied Monica and Aceviz to the hospital.

As to the events of August 4, 1992, Valerica testified that she saw Ellis for the first time when Ellis came to her home around 12 p.m. with six police officers. Valerica stated that she was shocked when she saw the police knocking at her window. Valerica said that she denied the officers access to her home as she felt she had done nothing wrong. Valerica felt that Ellis had no intention of talking to her because the police said, "You have to come with us."

Valerica admitted that besides some canned food, there was no food in the home on August 4. She explained that her parents brought food to the house and that she would take Monica to Burger King and Kentucky Fried Chicken. Valerica recounted that she was dressed to go buy food when the police arrived.

Valerica also testified that she is an adherent to Rumanian Orthodoxy and that she uses candles when she prays. According to Valerica, she was praying in her apartment and left a lit candle unattended. Valerica told Monica to undress for a bath and then Valerica went into the bathroom to draw a bath. Monica then ran out of the apartment with the candle and ran upstairs to the apartment where her paternal grandparents used to live and knocked on the door. Valerica said that she was right behind Monica and brought her back to the family's apartment.

Valerica stated that she became very upset by the thought of Monica being sexually abused and fell into severe depression. Valerica recalled that she was in such a state of depression on July 23, 1992, that she could not put her key into her door. Valerica explained that she spoke to a police officer near her home and told him that she was depressed and needed help. The officer took her to Swedish Covenant Hospital, but that hospital only gave her a pill and sent her home.

Valerica testified that the police took her to Ravenswood Hospital on the day that they removed Monica from her home. On the same day, Ravenswood Hospital transferred Valerica to Chicago Reed Mental Health Center (Chicago Reed). Valerica stayed at Chicago Reed from August 4, 1992, until August 28, 1992, when her family arranged to have her transferred to Mercy Hospital. Valerica was a patient at Mercy Hospital from August 28, 1992, until September 25, 1992.

Valerica stated that she continued to see the psychiatrist who had treated her at Mercy Hospital since her discharge on September 25, 1992, and was currently taking medication as a part of her treatment. Valerica related that her first husband, Pedro, was killed in an automobile accident eight years prior to the hearing and that she had a nervous breakdown. After recovering from the nervous breakdown, Valerica functioned normally until the instant incident.

Valerica's medical records from Chicago Reed were admitted into evidence. The diagnosis of psychotic disorder was published as were Valerica's statements upon admission and hospital personnel's observations. According to these records, Valerica stated that she felt her dead husband was alive and that her father was a warlock. Valerica was confused, delusional and experiencing auditory hallucinations.

At the conclusion of the adjudicatory hearing, the trial court found no sexual abuse. In so holding, the trial court focused on the fact that the evidence clearly showed there was no semen, that the slides were negative and that both the criminal court and the prosecutor were satisfied enough to dismiss the criminal charge against Ioan. Additionally, the trial court did not find dependency, reasoning that Valerica had the ability to care for her newborn even though she was depressed and had psychiatric problems. The trial court then entered a finding of neglect, noting the lack of food in the home and the delusional behavior of Valerica. The trial court further found that Ioan was not custodial at the time of the neglect as he was in jail.

On November 1, 1993, the trial court held a dispositional hearing. Marlene Brunelle, who is licensed as a physician in the Dominican Republic and was awaiting the results of her medical boards in the United States, testified that she met Valerica in October or November 1992, when Valerica, pregnant with her second child, came into the Milwaukee Family Health Center in Chicago for prenatal care. Brunelle, who was working in the health center as a medical assistant, testified that Valerica attended all of her prenatal care appointments. Brunelle further testified that it was her opinion that

Valerica was taking good care of her new baby, *viz.*, the baby enjoyed normal growth and was current with her immunizations.

Brunelle recounted that she saw Valerica and her new baby approximately 15 times. The last four times that Brunelle stopped at the family's home, she visited for one-half to one hour. In Brunelle's opinion the home was appropriate for the baby. Brunelle also recalled that she would have occasion to meet Valerica in the street with the newborn as Brunelle lived in the same neighborhood as the family. Brunelle never saw anything inappropriate. She did, however, observe Valerica crying because she missed Monica.

Frank Scheuerman, a DCFS caseworker who was assigned to Monica's case on September 15, 1993, recommended that DCFS be made the guardian of Monica. Scheuerman testified that Monica had been placed in the care of Valerica's relatives in Las Vegas, Nevada, for 15 months since the Petition was filed by DCFS. Scheuerman admitted that such placement of Monica by DCFS was in violation of the Interstate Compact on Placement of Children Act as no interstate compact was completed for Nevada. (See 45 ILCS 15/1 *et seq.* (West 1992).) Scheuerman indicated to the trial court that he had conversations with the relatives, who indicated that Monica was in day care and doing well.

Scheuerman did not know what services DCFS offered Valerica, but recalled that she was in private psychiatric care. Scheuerman did not remember the details of the letters he received from Valerica's psychiatrist which outlined her progress nor could he recollect whether she was still going to the psychiatrist. Scheuerman admitted that he made no attempt to contact Valerica's psychiatrist. Scheuerman was not aware of any services being offered to Ioan by DCFS or any other State or private agency.

Scheuerman then stated that he primarily recommended guardianship to DCFS because of the report of sexual abuse of Monica by her father. After the trial court advised Scheuerman that there was no finding of sexual abuse, Scheuerman said that the only other reason why he would make a recommendation of DCFS guardianship is because Valerica is moving to Nevada and she needs to be linked to psychiatric care. Scheuerman then stated that he would not recommend the immediate return of Monica as he would like a definitive answer to Valerica's mental health issues.

At the dispositional hearing, Valerica testified that she has seen her psychiatrist since August 28, 1992, on a monthly basis and that she was taking depression medication. Valerica stated that she would be moving to Las Vegas, Nevada, by the end of the week with her husband and newborn baby. Valerica indicated that she has family

in Las Vegas to assist her and that her sister would help her find a new psychiatrist. Valerica further testified that she had resumed living with her husband and that he had quit drinking.

Two letters from Valerica's psychiatrist concerning her mental health were published for the record. The first, dated January 20, 1993, certified that since Valerica's discharge from Mercy Hospital her mood has been appropriate, that there had been no evidence of psychosis and she has been capable of conducting her personal affairs. The January 20 letter further states that her prognosis was good as long as she continues her treatment and medication. The May 17, 1993, letter confirms the findings of the January 20 letter.

At the conclusion of the dispositional hearing, the trial court adjudged Monica a ward of the court, found Valerica and Ioan fit, willing, and able parents and returned Monica to her parents under a 12-month order of protection. The instant appeal followed.

## ISSUES PRESENTED FOR REVIEW

On appeal, the Public Guardian contends that: (1) the trial court erred in finding that there was no sexual abuse of Monica and (2) the trial court erred in returning Monica to the custody of her parents.

## OPINION

We begin our analysis with an examination of the Public Guardian's argument that the trial court erred in making a finding of no sexual abuse. Specifically, the Public Guardian urges that the medical evidence in tandem with Monica's verbalizations and Valerica's description of the incident established that it was more likely than not that Monica was sexually abused. We disagree.

We initially note that "[i]n all child custody proceedings under the Juvenile Act, the juvenile court's primary concern is the best interests and welfare of the children involved. [Citation.] To that end, the juvenile court is vested with wide discretion. [Citations.] That court's opportunity to observe the demeanor and conduct of the parties and witnesses must be given great weight, and, upon review, its determinations will not be disturbed unless they are against the manifest weight of the evidence." (*In re M.B.* (1992), 241 Ill. App. 3d 697, 705, 609 N.E.2d 731.) Applying this standard to the case *sub judice*, after an exhaustive review of the evidence presented in the trial court and the record on appeal, we cannot conclude that the trial court's determination of no sexual abuse is against the manifest weight of the evidence.

■ The Public Guardian submits that the medical evidence of Monica's being sexually abused was clear, unrebutted and convincing,

*viz.*, the genital examination performed by Dr. Nussbaum at Children's Memorial Hospital revealed that Monica had swollen and reddened labia and the presence of a white sticky substance on her genital area. However, as we noted above, the June 16, 1992, pathology report for Monica conclusively proved that the substance was not semen. A trial judge is not bound to accept the opinion of an expert on the ultimate determination. Experts opinions are only as valid as the bases or reasons for them. (*In re J.H.* (1987), 153 Ill. App. 3d 616, 505 N.E.2d 1360.) Thus, it was not improper or unreasonable for the trial court to have found the results of the pathology tests to be controlling and, consequently, conclude that the presence of the white substance and the swollen labia added nothing to the Public Guardian's case.

The Public Guardian also asserts that Monica's initial reluctance to answer Dr. Nussbaum's questions about the alleged sexual abuse followed by her affirmative answers to two of the questions in conjunction with the physical evidence discussed above provide "very convincing evidence that Monica was sexually abused." We disagree. We would note that the Public Guardian's presentation of this evidence before this court can be described as, at best, incomplete. The following is a *complete* list of the questions and answers contained in Dr. Nussbaum's report:

"Questions asked by me in English and *** translated by mother[.]

Questions [and] answer[s] by child [given by a] nod of head or yes/no answer[.]

1. Did your father hurt you? [Answer:] No

2. Did your father touch you where you go pee-pee? [Answer:] No

3. Did your father touch your bottom? [Answer:] No

4. Did you take off your clothes during your nap yesterday? [Answer:] No

5. Did your father take off your clothes during your nap yesterday? [Answer:] No

6. Did your father take off his clothes during your nap yesterday? [Answer:] Yes

7. Did your father touch you with his penis? [Answer:] No

8. Did your father go pee-pee in the bed during your nap yesterday? [Answer:] Yes."

Clearly, Monica's answers when viewed *in toto* could support a finding of no sexual abuse as easily as they would a finding of abuse. Accordingly, we find no abuse of discretion by the trial court with regard to this or any other evidence admitted at the hearings.

■ Still to be considered is the Public Guardian's contention that

the trial court erred in returning Monica to the custody of her parents despite compelling evidence that such a disposition is not in her best interest. Because the evidence presented by the Public Guardian in this case is not compelling and the trial court's finding is free of manifest error, it logically follows that the Public Guardian's argument founded upon such error necessarily fails.

## DISPOSITION

In light of the foregoing, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

CERDA and GREIMAN, JJ., concur.