*In re* GUSTAVO H. *et al.*, Minors, Respondents-Appellants (The People of the State of Illinois, Petitioner, v. Rocio T. *et al.*, Respondents-Appellees).

First District (4th Division)    No. 1—05—2033

Opinion filed November 23, 2005.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), for appellants.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Nancy Kisicki, and Yvette Loizon, Assistant State's Attorneys, of counsel), for the People.

Edwin A. Burnette, Public Defender, of Chicago (Emily H. Eisner, Assistant Public Defender, of counsel), for appellee Rocio T.

Stephen Jaffe, of Chicago, for appellee Gustavo H., Sr.

JUSTICE GREIMAN delivered the opinion of the court:

Following a temporary custody hearing, the trial court found that there was no probable cause to believe that minor siblings Gustavo H. and Krystal C. had been abused or neglected. Accordingly, the trial court dismissed petitions for the adjudication of wardship of the minors filed by the State pursuant to the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/1—1 et seq. (West 2004)). The Office of the Public Guardian (Public Guardian), the minors' court-appointed attorney and guardian ad litem, appealed on behalf of the minors. On appeal, the Public Guardian contends that the trial court's dismissal of the petition was contrary to the manifest weight of the evidence, which established probable cause that Gustavo and Krystal were abused and neglected. The Public Guardian further contends that the trial court abused its discretion in denying the Public Guardian's motion to reconsider its ruling because the motion demonstrated that the Public Guardian had exercised due diligence and that certain newly discovered evidence was not cumulative. Though the State does not join the Public Guardian as an appellant, it filed a brief in support of the Public Guardian's contention that the trial court's dismissal of the petitions for adjudication of wardship was contrary to the manifest

weight of the evidence. Respondents, Rocio and Gustavo, Sr., contend that this appeal should be dismissed because only the State may prosecute a petition for adjudication for wardship and appeal its dismissal.

On April 6, 2005, the State filed petitions asking the court to adjudge Gustavo and Krystal wards of the court and scheduling a temporary custody hearing for April 27, 2005. The petition regarding Gustavo alleged that he was neglected pursuant to section 2—3(1)(b) of Act, because he was a minor whose environment was injurious to his welfare, and that he was abused pursuant to section 2—3(2)(i) of the Act, because his parents, Rocio and Gustavo, Sr., inflicted, caused to be inflicted or allowed to be inflicted physical injury upon him, and section 2—3(2)(ii) of the Act, because his parents created a substantial risk of physical injury to him. In support of these allegations, the State cited the following facts:

"On or about February 4, 2005, this minor presented at St. Anthony's Hospital with a large hematoma on the right side of his head. This minor was diagnosed with a right parietal skull fracture, healing rib fractures and a healing fracture of the wrist. Medical personnel indicate that this minor's skull fracture may be consistent with the explanation provided by the natural parents. Further, medical personnel indicate that in the absence of any history, the other injuries sustained by this minor are suspicious for abuse. Natural parents reside together and were custodial at all relevant times."

The petition regarding Krystal alleged that she was abused pursuant to section 2—3(2)(ii) of the Act and neglected pursuant to section 2—3(1)(b) of the Act. In support of these allegations, the State cited the fact that Krystal's sibling had suffered skull, wrist and rib fractures.

Prior to the temporary custody hearing, Gustavo, Sr., admitted to being Gustavo's father. Gustavo, Sr., and Rocio, the minors' mother, denied that Gustavo, Sr., was Krystal's father. Immediately before the custody hearing on April 27, 2005, the trial court appointed the Public Guardian to represent Gustavo and Krystal as their attorney and guardian *ad litem*, the public defender to represent Rocio and attorney Michael Kozubek to represent Gustavo, Sr. The court called a recess to allow the attorneys to speak with their clients and then recalled the case.

At the hearing, Rocio testified that she was the mother of Gustavo, born August 26, 2004, and Krystal, born July 1, 2001. Rocio, the minors and Gustavo, Sr., lived with Rocio's parents, three sisters and brother. In general, while Rocio worked during the day, her mother

and Gustavo, Sr., would care for Gustavo. According to Rocio, Gustavo was a happy baby who was occasionally fussy but cried a normal amount for a baby of his age. Rocio testified that in January 2005, she took Gustavo to his pediatrician, Dr. Glaab, for a checkup. Dr. Glaab examined Gustavo and found no indication of broken bones. Also in January 2005, Rocio took Gustavo to another doctor to treat a gum infection. That doctor also did not find any indication of broken bones.

On February 4, 2005, Gustavo, Sr., had been caring for Gustavo while Rocio was at work. When Rocio returned home, she gave Gustavo a bath. Rocio noticed a soft spot on the side of Gustavo's head. Rocio and Gustavo, Sr., took Gustavo to the emergency room at St. Anthony's Hospital. After examining Gustavo and performing tests, the emergency room doctors informed Rocio and Gustavo, Sr., that Gustavo had a fracture on the right side of his head and fractures in his wrist, leg and ribs. Rocio could not, at that time, explain what had caused the fractures.

Rocio's mother had left for a trip to Mexico on February 3, 2005. When she returned on February 5, 2005, she told Rocio that either the day before she left or the day she left, she had been caring for Gustavo, who was asleep on her bed, while Rocio was at work, when she heard Gustavo crying. Rocio's mother went into her room and found Krystal in the room and Gustavo on the floor. Rocio testified that Krystal was very large and active for her age. Krystal was three years old and weighed 62 pounds. On more than one occasion, Rocio had witnessed Krystal playing inappropriately with Gustavo. Specifically, Rocio had found Krystal jumping on the bed on which Gustavo was lying, jumping on Gustavo, squeezing his cheeks, hugging him extremely hard, throwing things at him and slapping him. Rocio repeatedly told Krystal that Gustavo was a small baby and that her behavior was inappropriate, but Krystal quickly forgot her mother's admonishments and continued to be rough with the baby. Rocio testified that she occasionally spanked Krystal but did not spank Gustavo and that Gustavo, Sr., did not spank either minor.

Department of Children and Family Services (DCFS) caseworker Josephine Carrasco testified that on February 4, 2005, DCFS received a hot line telephone call indicating that Gustavo had been brought to the Saint Anthony's Hospital emergency room with trauma to the right side of his head. Carrasco was assigned to Gustavo and Krystal's case on February 7, 2005. In the course of her investigation, Carrasco spoke with Dr. Martinez, the emergency room doctor who had treated Gustavo. Dr. Martinez had examined Gustavo and had ordered bone surveys. The surveys showed that Gustavo had a fractured skull, three healing rib fractures, a healing wrist fracture and a healing leg

fracture. Dr. Martinez opined that Gustavo had not been abused or neglected and that the injuries were accidental and may have been caused by Krystal.

Carrasco also spoke with Dr. Glaab, the family's pediatrician who had treated both Gustavo and Krystal. Dr. Glaab indicated to Carrasco that she had told Rocio that Krystal should not be left alone with Gustavo because Krystal was rough and big for her age. Dr. Glaab opined that all of Gustavo's injuries could have all been caused by Krystal and that they were not caused by Rocio, Gustavo, Sr., or Rocio's mother.

Carrasco testified that Chicago police department Detective Robert Seguess had also investigated the case. According to Carrasco, in the course of his investigation, Seguess was also told that on either February 2 or 3, 2005, Rocio's mother was caring for Gustavo, who was asleep in her bedroom, and that when Rocio's mother heard Gustavo crying, she went to her bedroom and found him on the floor. In Rocio's mother's bedroom, Seguess observed a dresser within a couple of feet of the bed. From his observation, Seguess opined that Gustavo had fallen out of the bed and hit his head on the dresser.

Carrasco brought the case to the Multi-disciplinary Pediatric Education and Evaluation Consortium (MPEEC). She explained that when a child under investigation has sustained a head injury, the case is brought to the MPEEC. An MPEEC doctor is assigned to the case to assess medical records and films and to make a determination of whether the injuries are consistent with the explanations provided by the parents and whether the injuries are accidental or nonaccidental. Dr. Leonhardt was assigned to Gustavo's case. Dr. Leonhardt requested additional bone surveys from Children's Memorial Hospital. Those surveys, taken 20 days after Rocio and Gustavo, Sr., first took Gustavo to the Saint Anthony's Hospital emergency room, showed that Gustavo had a fractured skull, a fractured wrist and three fractured ribs. Carrasco testified that Dr. Leonhardt opined that the skull fracture could have been caused by Gustavo's fall from the bed, but that the rib and wrist fractures could not have been the result of the fall. According to Carrasco, Dr. Leonhardt believed that the rib injuries had been caused by squeezing, shaking or hitting and that they could not have been caused by a three-year-old. However, Dr. Leonhardt had never interacted with Krystal. Carrasco testified that Dr. Leonhardt recommended that the minors be returned home with close family services in place. A summary statement of Dr. Leonhardt's findings was admitted into evidence. The content of the statement was consistent with Carrasco's testimony regarding Dr. Leonhardt's opinions.

Carrasco testified that from the time Gustavo was released from the hospital until early April 2005, the minors resided away from Rocio and Gustavo, Sr., with their maternal aunt. Since April 2005, Rocio and Gustavo, Sr., had moved out of the house they had formerly shared with Rocio's parents and siblings and Gustavo and Krystal had been residing in the house, cared for primarily by Rocio's mother. Carrasco had observed Rocio and Gustavo, Sr., interacting with the minors at the hospital and at the minors' aunt's house. She found Rocio and Gustavo, Sr., to be loving, caring parents. Carrasco testified that since Gustavo's release from the hospital, Rocio and Gustavo, Sr., had spent substantial time at the minors' aunt's house caring for them. Carrasco also screened the other members of the family who had been living with Gustavo and Krystal and determined that none of them were likely to abuse the minors. Carrasco had no concern for the health and safety of the minors should they be returned to the care of Rocio and Gustavo, Sr., and recommended that the court return the minors to the care of their parents, that it impose an order of protection and that it order Rocio and Gustavo, Sr., to participate in parenting classes and Krystal to participate in a Head Start program.

Following the hearing, the court found that probable cause that Gustavo and Krystal were abused or neglected did not exist. The stated basis for the court's finding was:

"Insufficient evidence of non-accidental injury [and] insufficient evidence of neglect. Suspicion of abuse by reviewing physician [was] insufficient in [light] of [evidence] of treating M.D., Dr. Martinez, [and] treating M.D.[,] Dr. Glaab, [and] results of [defendants' and] Chicago police investigations."

Accordingly, the court dismissed the State's petitions for adjudication of wardship of the minors.

The State and the Public Guardian filed motions for reconsideration. In their motions, the State and Public Guardian included an addendum to Dr. Leonhardt's summary statement. The addendum stated that Dr. Leonhardt was of the opinion that Gustavo was the victim of child abuse and that, in forming his opinions, he was aware that Krystal weighed 62 pounds. Despite her large size, Dr. Leonhardt believed that Krystal did not cause Gustavo's rib fractures. The State and Public Guardian argued that the court had applied the incorrect "preponderance of the evidence" standard, rather than a "probable cause" standard, that the State had shown probable cause that the minors were abused or neglected, that they had used due diligence in investigating the matter and that the addendum was not cumulative.

The trial court denied the motions for reconsideration. It noted that it had applied the correct standard in finding that the evidence

did not show probable cause that Gustavo and Krystal were abused or neglected. It further stated that it "found the mother, [Rocio], to be a very credible witness. Her demeanor was appropriate. She was not evasive and she was not impeached. The DCFS investigator was also credible and professional." The court found that, though the State had proven a *prima facie* case of abuse or neglect, the State's case was overcome by the weight of the evidence presented. Specifically, the court cited the opinions of Dr. Martinez and Dr. Glaab, that Gustavo's head injury was a result of his fall from the bed and that Krystal caused his other injuries. With regard to the addendum, the court noted that the State filed its petition for wardship on April 6, 2005. The State then had until the temporary custody hearing on April 27, 2005, to investigate its case. During that time, the State was free to interview Dr. Leonhardt and could have called him as a witness at the hearing. Accordingly, the State had not demonstrated that it was unable to obtain Dr. Leonhardt's addendum prior to the hearing. Furthermore, the court found the addendum cumulative because Dr. Leonhardt's summary statement, which was admitted into evidence at the hearing, encompassed the opinions expressed in the addendum. The Public Guardian appealed.

We will first address Rocio and Gustavo, Sr.'s contention that this appeal should be dismissed because the Public Guardian does not have the authority to prosecute an appeal of the trial court's dismissal of a petition for wardship. In support of their contention, Rocio and Gustavo, Sr., cite *In re J.J.*, 142 Ill. 2d 1 (1991), and *In re D.S.*, 198 Ill. 2d 309 (2001), which hold that only the State, not a guardian *ad litem*, may prosecute a petition for adjudication of wardship. The Public Guardian responds that *In re J.J.* actually supports its appeal because in that case, the party in interest on appeal was the minor's guardian *ad litem*. The Public Guardian further notes that under the Act, a minor has a right both to an attorney and to a guardian *ad litem* and has a right to "be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, [and] to examine pertinent court files." 705 ILCS 405/1—5(1) (West 2004). Accordingly, argues the Public Guardian, a minor has a right to appeal through his attorney. Finally, the Public Guardian notes that, though the State is an appellee in this action and has not joined the notice of appeal, its brief supports the Public Guardian's position.

■ In all child custody proceedings under the Act, the court's primary concern is protecting the best interests of the children involved. *In re Ashley F.*, 265 Ill. App. 3d 419, 424 (1994); 705 ILCS 405/1—2 (West 2004). Section 1—5 of the Act provides that a minor who is the subject of proceedings under the Act has a right to be

present, to be heard, to present material evidence, to cross-examine witnesses, to examine pertinent court files and records and to be represented by counsel. 705 ILCS 405/1—5 (West 2004). Additionally, under the Act, immediately upon the filing of a petition alleging that a minor is abused or neglected, the court must appoint a guardian *ad litem*. 705 ILCS 405/2—17(1) (West 2004). The guardian *ad litem* is charged with representing the best interests of the minor and with presenting recommendations to the court consistent with that duty. 705 ILCS 405/2—17(1) (West 2004). "It has long been established that, upon the filing of a petition under the Juvenile Court Act, the 'people become the real party complainant and must prosecute the proceeding.'" *In re D.S.*, 198 Ill. 2d at 322, quoting *People v. Piccolo*, 275 Ill. 453, 455 (1916); *In re J.J.*, 142 Ill. 2d at 6. Section 1—6 of the Act provides that the State's Attorney "shall represent the people of the State of Illinois in proceedings under this Act." 705 ILCS 405/1—6 (West 2004). By extension, a guardian *ad litem* does not have authority to prosecute a petition brought pursuant to the Act. *In re D.S.*, 198 Ill. 2d at 333.

In *In re J.J.*, DCFS filed petitions for adjudication of wardship of three minors and the Public Guardian was appointed the minors' attorney and guardian *ad litem*. The State filed a motion to dismiss the petitions. Without considering the merits of the petitions or the motion, the trial court dismissed the petitions, noting that to compel the State to prosecute them would violate the doctrine of separation of powers. The minors, through the Public Guardian, appealed the dismissal. The appellate court reversed and remanded the matter for a hearing on the merits of the State's motion. On appeal, the supreme court acknowledged that in criminal matters, the State is afforded wide discretion in determining whether and what charges may be criminally brought against a defendant and that a court is not authorized to order the State to charge a defendant. However, the court noted, dependancy and neglect proceedings brought under the Act are civil, not criminal, in nature. Further, the court reasoned, both the trial court and the State are charged, under the Act, with protecting the best interests of the minor. Accordingly:

> "The evil of a court's attempting to invade the exclusive executive discretion of the constitutional office of the State's Attorney in controlling the initiation and management of criminal litigation is absent in dependency and neglect proceedings, where both the State's Attorney and the court are charged with the duty of ensuring that, at each step of the wardship adjudication process, the best interests of the minor, the minor's family and the community are served." *In re J.J.*, 142 Ill. 2d at 8-9.

The court, therefore, held that "the circuit court shall consider the merits of the motion and determine, on the record, whether dismissal is in the best interests of the minor, the minor's family, and the community." *In re J.J.*, 142 Ill. 2d at 9. Finally, the court noted that the order dismissing the petitions was final and appealable and that "[t]he public guardian has properly appealed." *In re J.J.*, 142 Ill. 2d at 12.

In *In re D.S.*, the trial court determined that it was in the best interests of the minor to set a permanency goal of substitute care pending a court determination on a termination of parental rights petition. Relying on *In re J.J.*, the supreme court held:

> "[O]nce the circuit court found that this particular permanency goal was in the best interests of D.S., the court had the duty and the authority, pursuant to section 2—28(3)(a) of the Act, to enter any order 'necessary to conform the minor's legal custody and status to the goal the court selected.' Therefore, *under these circumstances*, the circuit court appropriately ordered the State's Attorney to prosecute the termination petition as a means of accomplishing the permanency goal found to be in D.S.'s best interests." (Emphasis in original.) *In re D.S.*, 198 Ill. 2d at 327.

Though in both cases the supreme court noted that only the State is granted the authority to prosecute a petition filed under the Act, neither *In re J.J.* nor *In re D.S.* directly addresses the issue raised here: whether a minor's court-appointed attorney and guardian *ad litem* may appeal a trial court's ruling on the merits of a petition brought pursuant to the Act. Additionally, the parties have not cited, nor has our research revealed, a case that addresses the relevant issue. However, we note that case law is replete with cases in which a minor, through his court-appointed attorney and guardian *ad litem*, has appealed a trial court's ruling entered pursuant to the Act. See, *e.g.*, *In re Marcus H.*, 297 Ill. App. 3d 1089 (1998) (minor appealed trial court's finding that he was neglected but not abused); *In re A.M.*, 296 Ill. App. 3d 752 (1998) (minor appealed trial court's refusal to find that mother's former paramour was the perpetrator of sexual abuse); *In re D.H.*, 295 Ill. App. 3d 981 (1998) (minor appealed trial court's determination that a goal of long-term relative care, rather than adoption, was appropriate); *In re Ashley F.*, 265 Ill. App. 3d 419 (1994) (minor appealed trial court's dismissal of petition for adjudication of wardship); *In re Monica S.*, 263 Ill. App. 3d 619 (1994) (minor appealed trial court's order on petition for wardship, returning her to her parents); *L.F.H. v. People*, 256 Ill. App. 3d 451 (1993) (minor appealed trial court's order that she remain in referred placement).

■ We find that the above-cited cases were properly allowed and that this appeal, too, should not be dismissed. Under the Act, the

guardian *ad litem*, like the court and the State, is charged with protecting the best interests of the minor he or she represents. This responsibility would be compromised if the guardian *ad litem* were not permitted to appeal an order of the trial court that he or she believed was not in the best interest of the minor. Accordingly, we hold that, though the State has exclusive authority in the trial court to prosecute a petition brought under the Act, in order to fulfill their duty to protect the best interests of the minor they represent, the minor's attorney and guardian *ad litem* may appeal, on the minor's behalf, a trial court's order regarding a petition that they believe is contrary to the minor's best interests.

We now turn to the merits of the Public Guardian's contention, with which the State agrees, that the trial court's dismissal of the petitions was against the manifest weight of the evidence because the evidence established probable cause that Gustavo and Krystal were abused and neglected.

As noted above:

> "In all child custody proceedings under the Juvenile Act, the juvenile court's primary concern is the best interests and welfare of the children involved. [Citation.] To that end, the juvenile court is vested with wide discretion. [Citations.] That court's opportunity to observe the demeanor and conduct of the parties and witnesses must be given great weight, and, upon review, its determinations will not be disturbed unless they are against the manifest weight of the evidence." *In re M.B.*, 241 Ill. App. 3d 697, 705 (1992).

Section 2—10(2) of the Act provides that at a temporary custody hearing, a trial court first decides whether there is probable cause to believe that the minor is abused, neglected or dependent. 705 ILCS 405/2—10(2) (West 2004); *In re Ashley F.*, 265 Ill. App. 3d at 424. If the court finds probable cause, it is required to determine whether there is an urgent and immediate necessity for the protection of the minor to remove him from his home. 705 ILCS 405/2—10(2) (West 2004); *In re Ashley F.*, 265 Ill. App. 3d at 424. However, if the court finds that there is no probable cause to believe that the minor is abused, neglected or dependent, it must dismiss the petition. 705 ILCS 405/2—10(1) (West 2004); *In re Ashley F.*, 265 Ill. App. 3d at 424.

In its petitions for adjudication of wardship, the State alleged that Gustavo was abused under sections 2—3(2)(i) and (ii) and that Krystal was abused pursuant to section 2—3(2)(ii) of the Act. Section 2—3(2) defines an abused child as one whose

> "parent or immediate family member ***
>
> (i) inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means,

which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function;

(ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function[.]'' 705 ILCS 405/2—3(2) (West 2004).

The State additionally alleged that both minors were neglected under section 2—3(1)(b) of the Act, which provides that a neglected child is one whose environment is injurious to his welfare. 705 ILCS 405/2—3(1)(b) (West 2004). Neglect is a failure to exercise the care that the circumstances justly deserve and can be either a willful or an unintentional disregard of a parental duty. *In re Edward T.*, 343 Ill. App. 3d 778, 794 (2003). An injurious environment is an amorphous concept that cannot be defined with particularity; accordingly, the specific circumstances of each case must be reviewed. *In re B.M.*, 248 Ill. App. 3d 76, 79 (1993). Neglect of one minor may be taken as evidence of neglect of the minor's sibling. *In re Jerome F.*, 325 Ill. App. 3d 812, 818 (2001).

█ The Public Guardian specifically contends that the trial court erred in failing to find the minors abused because Dr. Leonhardt's summary statement, which was admitted into evidence, was the only evidence that specifically addressed Gustavo's rib injuries. Dr. Leonhardt concluded that the rib injuries could not have been caused by mishandling by Krystal or by Gustavo's fall from Rocio's mother's bed. We disagree with the Public Guardian's characterization of the evidence. At trial, Carrasco's testimony established that Dr. Martinez had examined Gustavo's bone scans taken at Saint Anthony's Hospital. Those scans indicated that Gustavo had suffered fractured ribs. Carrasco testified that Dr. Martinez opined that Gustavo's injuries were not the result of abuse or neglect and that they could have been caused by Krystal. Carrasco also testified that the family's pediatrician, Dr. Glaab, who had interacted with Krystal several times and had advised Rocio, before Gustavo sustained his skull fracture, that Krystal should not be left alone with Gustavo, also opined that all of Gustavo's injuries could have been caused by Krystal. The court, therefore, was presented with conflicting opinions as to the cause of Gustavo's rib injuries. As the court pointed out, Dr. Leonhardt had not interacted with Krystal, who was described as a rough, active, large child, while Dr. Glaab had interacted with her several times in the past. Accordingly, we cannot say that the court's conclusion that the evidence did not establish probable cause that Gustavo and Krystal were abused was contrary to the manifest weight of the evidence.

■ The Public Guardian further contends that the trial court erred in failing to find the minors neglected because, assuming Krystal caused Gustavo's injuries, the evidence presented at trial established probable cause that the minors' environment was injurious to their welfare. The State agrees and additionally contends that the fact that Gustavo sustained several fractures in his first five months of life indicates that his environment was injurious. The State reasons that the evidence that Gustavo was neglected created an unrebutted presumption that Krystal was also neglected.

In this case, Rocio testified that she had witnessed Krystal exhibiting inappropriate behavior with Gustavo. Rocio testified that she had admonished Krystal that she could not treat Gustavo in such a manner. Nonetheless, Krystal continued to be rough with her brother. Dr. Glaab also observed Krystal's active demeanor and advised Rocio not to allow Krystal to be alone with Gustavo. Carrasco testified that she had observed Rocio and Gustavo, Sr., interact with the minors and had concluded that they were attentive, loving and caring parents. The trial court found Rocio and Carrasco to be credible witnesses. It further found that the evidence did not indicate that Gustavo, and by extension Krystal, had been neglected. Given the wide discretion afforded the trial court in making a determination regarding neglect and its ability to observe the demeanor and conduct of the parties and witnesses (*In re Ashley F.*, 265 Ill. App. 3d at 425), in this case, we cannot say that the trial court's finding that the evidence did not establish probable cause of neglect was contrary to the manifest weight of the evidence.

■ Finally, the Public Guardian contends that the trial court erred in denying its motion for reconsideration because the motion established that the Public Guardian had exercised due diligence in investigating the case and that the proposed addendum to Leonhardt's summary statement was not cumulative.

"The purpose of a motion to reconsider is to bring to the court's attention changes in the law, errors in the court's previous application of existing law, and newly discovered evidence that was not available at the time of the hearing. [Citation.] To justify a rehearing on the basis of newly discovered evidence, there must be a showing of due diligence and a demonstration that justice has not been done. [Citation.] The trial court's decision will not be reversed absent an abuse of discretion." *In re Ashley F.*, 265 Ill. App. 3d at 426.

When the State filed petitions for adjudication of wardship of Gustavo and Krystal on April 6, 2005, it set April 27, 2005, as the date of the temporary custody hearing on the matter. On April 27, 2005,

the Public Guardian was appointed as the minors' attorney and guardian *ad litem*. Thereafter, the court allowed the parties a brief recess to speak with their clients and the available witnesses. When the court recalled the case and commenced the hearing, the Public Guardian did not object nor did it alert the court that it found Leonhardt's summary statement inadequate or that it would prefer to pass the case to enable it to interview or call Leonhardt as a witness. Accordingly, the Public Guardian did not demonstrate that it had exercised due diligence in attempting to obtain all pertinent opinions from Leonhardt. Accordingly, we find that the trial court did not abuse its discretion in denying the Public Guardian's motion for reconsideration.

For the above-stated reasons, we affirm the trial court's judgment.

Affirmed.

CAMPBELL, P.J., and MURPHY, J., concur.